[No. 16744. Department One. April 13, 1922.]

D. CORNWELL, *Appellant,* v. J. M. SLEICHER *et al.,*
*Respondents.*[1]

PHYSICIANS AND SURGEONS (10-1, 11)—MALPRACTICE—EVIDENCE—
SUFFICIENCY. It is error to grant a nonsuit in an action for mal-
practice in failing to properly reduce a simple fracture of the radius
of the right arm, where it appeared there was no misuse of the arm
during the treatment, and that at the time of the discharge the arm
was crooked and shortened, there was a visible lump, constant pain
and loss of flexion and a second operation was necessary to make the
arm even passably usable.

Appeal from a judgment of the superior court for
Lewis county, Abel, J., entered March 22, 1921, upon
granting a nonsuit, dismissing an action for malprac-
tice, tried to the court and a jury. Reversed.

*C. D. Cunningham* and *Forney & Ponder,* for appel-
lant.

*Bates & Peterson* and *A. E. Rice,* for respondents.

FULLERTON, J.—This is an action for malpractice.
On the trial in the court below, which was entered upon
by the court sitting with a jury, the plaintiff was non-
suited at the conclusion of his evidence, and appeals
from the judgment later entered.

The evidence which the jury would have been entitled
to believe, had the cause been submitted to them, was,
in substance, this: The plaintiff suffered a fracture
of a bone in his right arm through an accidental cause.
The fracture was an oblique fracture of the radius, the
fracture being about midway between the elbow and
the wrist. The plaintiff lived in a rural neighborhood,
and, after receiving the injury, consulted a local physi-
cian. The physician gave him temporary aid and ad-

[1]Reported in 205 Pac. 1059.

vised him to consult a surgeon, as he (the physician) did not have the facilities necessary to properly reduce the fracture. The plaintiff thereupon consulted the defendant Sleicher, a physician and surgeon practicing at Chehalis. The defendant undertook to reduce the fracture. He first took radiographs of the arm from two positions, and thereby discovering the nature of the fracture, sought to reduce it by "extension and counter-extension." After satisfying himself that he had the bones in place, he put upon the arm a wire splint intended as a temporary support, the swollen condition of the arm then forbidding placing it in a permanent cast. Another radiograph was then taken. The defendant being satisfied that the bones were in place, instructed the plaintiff as to the manner of carrying the arm in the meantime, and to return in ten days, when he would put on a permanent cast. The plaintiff returned as directed, whereupon the defendant removed the splint, and ocularly and digitally examined the fracture. He then remarked "that the bones were not quite together and he would slip them," and this he sought to do by pressure. The plaintiff then called his attention to a protuberance at the wrist, and examining this, the doctor remarked that the bone would have to be slipped a little, and proceeded to manipulate it. After working upon it for a moment, a "catch or snap was heard," when the protuberance disappeared. The doctor then placed the arm in a plaster cast, and told the plaintiff to return in three weeks. The plaintiff again returned as directed, when the doctor removed the cast. He then examined the arm and pronounced it satisfactorily healed. The plaintiff then called his attention to the fact that the arm was crooked and that it did not have its usual motion. The doctor then had him move his arm in

various directions, and told him that the difficulties complained of would be overcome in a short time. He then gave the plaintiff directions as to its future use; telling him the arm "was all right, but to be careful of it for a couple of weeks, then to go to work with it gradually and not strain it." The plaintiff then started for his home, riding in an automobile driven by his son. The arm soon became excessively painful. On feeling of his arm, he found a lump on the arm underneath the fracture, which he described by saying that "it seemed like I could hook my thumb right under the end of the bone sticking out." On reaching home, his son and some of his neighbors examined the arm. Testifying, they described it as crooked, and that there was a bunch underneath the arm, not only palpable to the touch, but visible to the eye.

The plaintiff, because of pain, carried the arm in a sling for a period of three weeks, and after taking it from the sling was unable to use it at all for a time, and after that only to a limited extent and with great pain. The plaintiff then consulted with another surgeon. This surgeon took radiographs of the arm, with the arm in the same positions it was when the first of the radiographs was taken. These, with other examinations made by him, convinced him that the arm required further treatment. He first thought it feasible to break the bony union which had formed and reset the bone. On further consideration, however, he concluded it was not so feasible, and treated the arm by cutting into the arm and chiseling off a protruding end of the fractured bone. The surgeon described the arm as showing "a slight angle," and a "very little shortening." He also testified that there was some loss of movement.

The plaintiff called the defendant as a witness on his own behalf and had him describe the treatment he

gave the arm and identify the radiographs taken by
him. On cross-examination by his own counsel, he
testified that the bones were in apposition when he
put on the wire splint and the permanent cast, and
were so when he removed the latter. The second sur-
geon, in answer to a hypothetical question embracing
this idea put to him on cross-examination, testified
that the treatment was that prescribed by all of the
books, and such as is commonly afforded by all physi-
cians practicing in the defendant's neighborhood. On
redirect examination, however, he testified as follows:

"Q. Doctor, if in spite of the fact he placed this
splint upon his arm, made a digital and an X-ray
examination, and afterwards put the arm in a plaster
cast and gave the patient instructions, and after the
plaster cast was removed, nevertheless the bone was
not in place, what would you say? A. Well, am I to
admit it was not in place when it was taken off? Q.
After the plaster cast was removed it was not in place,
that is, not in apposition, what would you say as to
whether the treatment was skillful or not? A. Well,
I understand it was in apposition. Q. Well, we will
suppose now it was not in apposition. A. Well, if it
was not in apposition it was not skillful, but we grant
that it was."

On further examination he testified that he knew
nothing about the condition of the arm when the de-
fendant quit treating it, and that it was not uncommon,
under the best treatment of fractures of this kind, for
the arm afterward to show a little shortening. Both
of the doctors agreed that fractures of this character
and at this place were not difficult of reduction.

The radiographs were introduced in evidence. The
first of those taken by the defendant and those taken
by the second surgeon are very distinct. The first
clearly shows the nature of the fracture of the radius,
and further shows, what the defendant did not dis-

cover until his attention was subsequently called to it by the plaintiff, a displacement of the ulna at the wrist. The second shows that the broken bone knitted while not in direct alignment, but while at an angle, and with one end of the fractured bone overlapping the other and protruding into the surrounding muscles. The second of the radiographs, the one taken after the wire splint was put on the arm, discloses nothing of the condition of the broken bone visible to the eye of a layman. There was further testimony on the part of the plaintiff that the arm had not regained its normal strength up to the time of the trial; that it was still crooked, and that there was a loss of flexion—the up and down movement of the wrist. The plaintiff testified to the effect, also, that he at all times followed the directions given him by the defendant as to the care of the arm, and that he did not misuse it in any manner.

Passing to the legal aspects of the case, it is the respondent's contention, and it was the view of the trial court, that there is not in the record any competent evidence showing that the treatment afforded the plaintiff by the defendant was negligent or unskillful; in other words, that it is not shown by competent evidence that the defendant did not bring to his treatment of the plaintiff's injury that degree of skill and care which is usually brought to the treatment of such injuries by surgeons practicing in the general locality in which the defendant resides. Perhaps the contention can be made more clear by quoting from the language of the defendant's learned counsel as used in their brief. They say:

"We do not contend for a minute in this court that a layman cannot testify to anything. The patient and the lay witnesses who were present have a right to

testify as to what the doctor did; as to whether he used an anaesthetic; as to whether he used instruments and as to whether the arm appeared crooked or straight, or whether there was anything different in the appearance of the arm after the operation than it was before. . . . We do not contend, however, that while a lay witness may testify to certain things, or certain appearances, or certain happenings, he cannot testify that the cause of the things, appearance or happenings was the result of either improper or unskillful treatment or negligence on the part of the attending physician or surgeon, and that before a jury or a court could decide that the said appearance, happenings or things observed and testified to by lay witnesses was the result of improper or unskillful treatment by a surgeon, there must be evidence of experts skilled in the profession to that effect. . . . In other words, in the instant case, lay witnesses may testify as to the condition of the arm when they saw it as to whether it was abnormal or not or looked different from what it did before the fracture, but neither a court nor a jury would be justified in determining that that condition was the result of improper or unskillful treatment until some expert has so testified.''

And again:

''So in the instant case. While lay witnesses testified as to what was done by the doctor, and to the result, no witness has testified that that result was so caused by any improper or unskillful treatment.''

With reference to the proposition, namely, that there must be evidence by a person skilled in the science of surgery that the treatment of a particular injury is negligent and unskillful before a court or jury can pronounce it so, we have heretofore dissented, and are not now in accord. As we said in *Wharton v. Warner*, 75 Wash. 470, 135 Pac. 235, the proposition is sound only when soundly applied. In that case the surgeon operating upon a patient left a part of the instrument with which he was operating—a metallic

spring twelve inches in length and a sixteenth of an inch in width—in the body of his patient. It was held that it did not require expert evidence to prove that the act was negligent, but, on the contrary, the jury had abundant justification to so find from proof of the fact alone. Other illustrations might be given, but the one is enough to make clear the point that there must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skilled in the particular science to show unskillful and negligent treatment. It seems to us that this is an instance of that sort. Both the defendant and the other surgeon testifying say that the fracture was without complications and one easy of reduction. The radiographs produced by the different surgeons show that the bones knitted much in the same position they were prior to any attempt at reduction. This taken with the evidence of the lay witnesses to the effect that there was no misuse of the arm between the time the fracture was reduced and the time the patient was discharged as cured; that, at the time of the discharge, the arm was crooked and shortened; that there was a lump in the region of the fracture palpable to the touch and visible to the eye; that there was a loss of flexion and almost constant pain in the arm, and that a second operation was necessary to make it even passably usable, is sufficient, in our opinion, to make the question whether the defendant had brought to the treatment of the arm that degree of care and skill usually brought to the treatment of similar fractures by surgeons practicing in his locality, one of fact for the jury rather than one of law for the court.

Moreover, we think there was here expert testimony to the effect that the treatment afforded the plaintiff

was unskillful. The second surgeon based his opinion that the treatment was skillful upon a hypothetical question which assumed that the fracture was reduced by the operating surgeon, the fractured bones placed in apposition, and that they were so at the time the permanent cast was put on the arm. In the quoted portion of his testimony, however, he expressed the opinion, reluctantly it may be conceded, that if the opposite of these conditions were the fact, the operation was not skillful.

Our conclusion is that the court erred in withdrawing the question of the defendant's liability from the jury, and that the judgment should be reversed and remanded for a new trial. It is so ordered.

MITCHELL, TOLMAN, and BRIDGES, JJ., concur.