[No. 30346.   *En Banc.*   October 28, 1948.]

ORMAN KEITH SCOBBA *et al., Respondents,* v. THE CITY OF
SEATTLE *et al., Appellants.*[1]

[1]Reported in 198 P. (2d) 805.

*A. C. Van Soelen* and *Arthur Schramm,* for appellant city of Seattle.

*Robert S. MacFarlane* and *James W. Hodson,* for appellant Northern Pacific Railway Company.

*Torbenson & Baum* and *Richard M. Thatcher,* for respondents.

SCHWELLENBACH, J.—The plaintiffs sued the city of Seattle and the Northern Pacific Railway Company for damages, as the result of a collision between a Northern Pacific train and a city bus, on which the plaintiff husband was a passenger. The complaint alleged that the proximate cause of the collision was the concurring negligence of the railroad company, acting through its engineer, and of the city, acting through its bus driver. This was admitted by the city. The railroad company denied that the proximate cause of the collision was the *concurring* negligence of the company and the city. It admitted that the negligence of the city, alone, was the proximate cause.

We shall refer to plaintiff husband as if he were the sole plaintiff.

The complaint alleged that at the time of the collision, the city of Seattle had in effect ordinance No. 73375. This was admitted by all defendants.

Paragraph No. 9 of the complaint alleged that the city was negligent in the following:

"(1) In traversing the crossing while the mechanical and electrical signals continued to give a signal of the approach of a train.

"(2) In failing to observe said railroad grade crossing signal.

"(3) In failing to yield the right of way to said train.

"(4) In failing to heed the warnings of a signalman of the railway company.

"(5) In operating the bus at a high, dangerous and unlawful rate of speed.

"(6) In failing to keep the bus under control."

The city denied subds. 5 and 6. The railroad company denied subd. 5.

Paragraph No. 10 alleged that defendant Allison (the engineer) was negligent in the following:

"(1) In operating the train in excess of the rate of ten miles per hour.

"(2) In operating the train at a high, dangerous and excessive rate of speed.

"(3) In failing to keep the train under control."

This was admitted by the city. The railway company admitted that the train was operated in excess of ten miles per hour and denied the balance of the allegations.

As an affirmative defense, the city alleged that it was an employer engaged in extrahazardous employment; that the plaintiff was engaged in extrahazardous employment; that because of the foregoing the court was without jurisdiction to hear the matter. This was denied by the plaintiff.

As an affirmative defense, the railway company alleged that the sole and proximate cause of the collision was the negligence of the city. This was denied by plaintiff.

The collision occurred at a railroad crossing in the city of Seattle. Spokane street is a paved city street running in an east-west direction. It consists of a northerly lane sixty feet wide for westbound traffic and a southerly lane thirty feet

wide for eastbound traffic. The two lanes are separated by an unpaved portion upon which was built the West Seattle viaduct. Between First avenue south and Fourth avenue south, Spokane street is intersected by two parallel main-line railroad tracks running north and south, used jointly by the Great Northern Railway Company and the Northern Pacific Railway Company. The collision occurred at the intersection of the south or eastbound lane of Spokane street and the main-line tracks. North of the crossing, a spur track leads off southwesterly from the west or southbound main-line track. The spur track crosses the eastbound lane of Spokane street about one hundred forty feet from the west main-line track.

Controlling eastbound vehicles at the intersection are two crossing signals. They consist of the familiar crossbuck signs reading "Railroad Crossing," and two red lights blinking alternately, side by side. Beneath these lights are four more red lights burning steadily and illuminating the letters "S-T-O-P." One signal is placed just west of the main-line track and the other just west of the spur track. Each signal also contains an electric gong device. Approaching trains from either direction actuate a buzzer in the watchman's shanty, situated at the northeast corner of the intersection. When the approaching train is in sight, the watchman turns on the electric signal system.

On the morning of January 23, 1946, plaintiff was a passenger on a bus operated by the city and driven by one Paulsen. The bus was headed east on Spokane street. As Paulsen approached the grade crossing, the electrical signals were operating. He stopped at the spur track a short distance from the main line. One Munter was driving his car to work, going in the same direction. He drove past the bus and pulled up at the west main line to permit a Great Northern passenger train, headed south out of town, to go by. After it passed over the crossing, the signals continued to function and Munter, looking to the right, saw an incoming Northern Pacific passenger train on the other track. He waited for it to pass.

In the meantime, after the Great Northern train cleared the crossing, the bus driver started up. He heard and saw the signals but thought they were for the train that had just passed. He passed to the right of Munter's car and, just as he was on the track, saw the train for the first time. He tried to cross, and the rear of the bus was struck by the engine. When the train stopped, the bus had been turned around, and its front end came to rest alongside the front end of the third baggage car on the train.

The Northern Pacific train was due in Seattle at 7:00 a. m. The accident occurred at 8:27 a. m. They had been traveling about thirty-five miles per hour, but about a quarter of a mile east of Spokane street had reduced the speed to eighteen to twenty miles per hour. The engineer was seated on the right, and the fireman on the left. Their engine passed the end of the Great Northern train about three hundred feet from the crossing. The engineer then blew the crossing whistle of two long, a short, and a long, which he continued to carry until he applied the brakes. The fireman saw the bus start up from the spur track, but did not think it would attempt to pass. When he realized that the bus was not stopping, he gave the engineer a "wash-out" signal, and the engineer applied the emergency brakes. The engine was about forty feet from the crossing when the fireman yelled. The train traveled about three hundred forty feet after the brakes were applied.

The trial court withdrew from the jury the affirmative defense of the city that the case came within the purview of the workmen's compensation act, and instructed them that the sole question to be determined as between the plaintiff and the city was the amount of damages to be recovered by plaintiff.

The trial court also withdrew from the jury the allegation in plaintiff's complaint that the defendant railroad and Allison were negligent in any respect, except in operating the train at a rate of speed in excess of ten miles per hour. In instruction No. 4, after quoting ordinance No. 73375, it instructed:

"Thomas Allison and Northern Pacific Railway Company were negligent as a matter of law in operating their train at a speed in excess of ten miles per hour.

"If you find from the evidence, by the requisite degree of proof, that said negligence was one of the proximate causes of the collision and the damage sustained by plaintiff Orman Keith Scobba, if any, you will find for the plaintiffs and against Thomas Allison and Northern Pacific Railway Company."

The jury rendered a verdict for the plaintiff and against only the defendant city, in the sum of ten thousand dollars. The city moved for a judgment n.o.v. or, in the alternative, for a new trial. The plaintiff moved for a judgment n.o.v. against the railway company and Allison, in the sum of ten thousand dollars, or, in the alternative, for a new trial.

The trial court granted the motion of the city for a new trial unless within ten days the plaintiff consented to remit from the verdict the sum of six thousand dollars and to take judgment for four thousand dollars. The trial court also granted the motion of plaintiff for judgment n.o.v. against defendant railway company and Allison; that he have judgment against such additional defendants in the sum of four thousand dollars, or, in the alternative, for a new trial against the additional defendants. The plaintiff consented to judgment against all defendants in the sum of four thousand dollars. The city and the additional defendants have appealed. Respondent now asks a review by this court of the action of the trial court, reducing the amount of the judgment to four thousand dollars.

There are three issues for us to determine: whether respondent came within the purview of the workmen's compensation act; whether the speed of the train in excess of the provisions of the city ordinance was a proximate cause of the collision; and a review of the order of the trial court reducing the amount of the verdict from ten thousand dollars to four thousand dollars.

Respondent had been employed for some time as a repair man for the Burroughs Adding Machine Company. The company had service agreements with various companies

and private persons to service their machines. There were two kinds of employees doing this work, shop employees and outside employees. Respondent was an outside employee. Shop employees were sent out to jobs under direct orders from the office. Outside employees were given lists of names in a territory assigned to them and could use their own judgment as to the order in which the customers would be serviced. Outside employees were not required to go to the office each morning. If they did go to the office for instructions, they were allowed transportation to the first job. In that event, their daily employment started when they left the office. Otherwise, their employment started when they reached the first job. The usual starting time was eight o'clock.

Two or three days before, respondent had been given a list of about one hundred customers and had already called on some of these. On the evening of January 22, 1946, he went to the office to replenish his tool kit. The kit weighed thirty-five pounds, and he left it at the office as a matter of convenience, not wishing to carry it home and back again. The morning of January 23rd, he left his home in the north end of town at about five minutes to seven to take a bus to work. The bus arrived downtown at First and Pine about 7:30. He walked up to the office at 1118 Fourth avenue, picked up his tool kit, and walked back to First and Seneca, where he took a bus going south, using the transfer he had been given when he left home. At First south and Spokane street, he transferred to the bus involved in the collision. The company did not pay his fare to the first job that day. He did not report to the office that morning, his only reason for going there being to pick up his tool kit.

■ In *D'Amico v. Conguista*, 24 Wn. (2d) 674, 167 P. (2d) 157, we laid down the following requirements:

"Under our workmen's compensation act, definite conditions must exist at the time of an injury in order to entitle one to the benefits of the act. First, the relationship of employer and employee must exist between the injured person and his employer (except in some cases where the injured person is an independent contractor); second, the injured

person must be in the course of his employment; third, that the employee must be in the actual performance of the duties required by the contract of employment; and, fourth, the work being done must be such as to require payment of industrial insurance premiums or assessments."

In the recent case of *McCarty v. King County Medical Service Corp.*, 26 Wn. (2d) 660, 175 P. (2d) 653, the plaintiff, an elevator operator in the Chamber of Commerce Building in Seattle, employed on the basis of pay by the hour, entered the building at about 7:30 a. m. She was proceeding to take the elevator to the third floor to prepare to go to work at 7:45. When the elevator door opened, she stepped into an open shaft and was injured. In holding that she was not injured in the course of her employment, we said:

"We believe and hold that respondent's injuries were not sustained while she was in the course of her employment as an elevator operator in the building of the Seattle Chamber of Commerce, but while she was an invitee entering the building and going to the place where she was to change her street clothes to working clothes, *preparatory to commencing her employment* as an elevator operator. . . .

"We find that Rose McCarty was not injured in the course of employment, but prior to assuming her duties and at a time when she was not under pay."

■ We find no conflict in the testimony which would warrant the jury in finding that the respondent was in the course of his employment at the time and place of the accident. He was not then and there in the actual performance of the duties required by the contract of employment. The case, therefore, does not come within the purview of the compensation act.

At the time of the accident, ordinance No. 73375 was in effect. It provided:

"It shall be unlawful for any person to operate any locomotive, automobile, or train over or across any public place except where overpasses or underpasses exist, at a greater speed than ten miles per hour."

As already stated, the trial court instructed the jury that Allison and the railway company were negligent as a matter

of law in operating their train at a speed in excess of ten miles per hour. The testimony showed that the train was traveling at from eighteen to twenty miles per hour and the bus at about ten miles per hour. The court fully and adequately instructed the jury as to the law of proximate cause.

■ Proximate Cause has been defined in 38 Am. Jur. 695, Negligence, § 50:

"The proximate cause of an injury is that cause, which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. Other definitions which have received judicial approval are: that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, without which act or omission the injury would not have been inflicted; the cause which leads to, produces, or contributes directly to, the production of the injury of which complaint is made; the efficient cause; the one that necessarily sets the other causes in motion, and brings about the result without the intervention of any force started and working actively from a new and independent source. Proximate cause is also defined as the primary moving cause, or the predominating cause, from which the injury follows as a natural, direct, and immediate consequence, and without which it would not have occurred."

"An injury cannot be attributed to a cause unless, without it, the injury would not have occurred. Accordingly, the mere concurrence of one's negligence with the proximate and efficient cause of a disaster will not impose liability upon him; it is well settled, however, that negligence, in order to render a person liable, need not be the sole cause of an injury. It is sufficient for such purpose that it was an efficient concurring cause, that is, a cause which was operative at the moment of the injury and acted contemporaneously with another cause to produce the injury, and which was an efficient cause in the sense that except for it the injury would not have occurred. The fact that some other cause concurred with the negligence of a defendant in producing an injury does not relieve the defendant from liability unless he shows that such other cause would have produced the injury independently of his negligence, or unless he shows, as he is permitted in some jurisdictions,

that the other cause, being an act of God or natural force, was so much more destructive than his negligence that he should be held liable only for the proportionate amount of the damages caused by his fault. Under the rule that the court will trace an act to its proximate, and not to its remote, consequences, there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury. Negligence which was operative at the time an injury was inflicted may constitute the proximate cause of the injury and be actionable, notwithstanding it concurred with the act of a third person to produce the injury. One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the act of a third person may have contributed to the final result." 38 Am. Jur. 715, Negligence, § 63.

However, it is often difficult to apply the rule to any given set of facts:

"Definitions of 'proximate cause' are easily given in general terms, but they are very difficult in practical application to the facts of particular cases. As has been said: 'What is the proximate cause of an injury in a legal sense is often an embarrassing question, involved in metaphysical distinctions and subtleties difficult of satisfactory application in the varied and practical affairs of life.' No exact rule for determining when causes are proximate and when remote has yet been formulated. Indeed, it is impossible by any general rule to draw a line between those causes of injuries which the law regards as sufficiently proximate, and those which are too remote to be the foundation of an action. In the language of the United States Supreme Court, each case must be 'decided largely on the special facts belonging to it, and often on the very nicest discriminations.' The line between proximate and remote consequences is exceedingly shadowy; so much so that the one fades away into the other, rendering it often very difficult to determine whether there is such a connection between the wrong alleged and the resulting injury as to place them, in contemplation of law, in the relation of cause and effect. Making such determination is something like drawing 'a line between night and day.' There is, moreover, a marked distinction between the proximate cause of an accident, and the proximate cause of the injury resulting from the accident. In other words, the proximate cause of the law is not the proximate cause of the logician, nor even always in strictness the proximate

cause in fact, and a jury may easily be confused and misled by overniceties in abstractions. It has been said that the practical administration of justice prefers to disregard the intricacies of metaphysical distinctions and subtleties of causation, and to hold that the inquiry as to natural and proximate cause and consequence is to be answered in accordance with common sense and common understanding. No court is bound to 'stick in the bark' of the maxim 'causa proxima, non remota, spectatur;' on the contrary, it is its duty to ascertain and give effect to the spirit of the principle which the maxim dimly indicates, but does not fully express. A contributing cause from a scientific standpoint is not necessarily a proximately contributing cause from a legal standpoint. Proximate cause shall be determined upon mixed considerations of logic, common sense, policy, and precedent." 38 Am. Jur. 700, Negligence, § 53.

᠂ ■ The trial court recognized that it could not grant a motion for judgment n.o.v. unless it could say, as a matter of law, that there is neither evidence, nor reasonable inference from evidence, to sustain the verdict; that the motion must be overruled if there is competent evidence reasonably tending to support the verdict. The court then went on to say in its memorandum opinion:

"I think it can be demonstrated that the speed of the train was the proximate cause of the collision. As to the speed of the train, the lowest estimate was eighteen miles per hour. In view of the fact that a train traveling at 1 mile an hour covers 1.493 feet in one second, a train traveling at 18 miles an hour would travel 26.71 feet in one second, so had the train been traveling at 10 miles an hour it would have been 11.78 feet away from the point of impact at the time in question.

"The evidence shows that the drawbar on the engine was 10 feet wide and that the train was struck by the coupling pin in the center of the drawbar, or cowcatcher, so that the bus had 8½ feet to go to clear the train. It is undisputed that the bus was going, at the very lowest estimate, 8 miles an hour and was increasing its speed, therefore the train had 11.78 feet plus to go at 18 miles an hour which would take it 7.8 [.78] plus seconds to reach the point of collision. In this 7.8 [.78] plus seconds the bus would have traveled approximately 12 feet at the speed of 8 miles an hour and would have cleared the train by at least 3½ feet. It seems

to me, therefore, that it appears as a mathematical certainty that the accident in question would not have occurred had it not been for the violation of the speed ordinance by the train, and that as a matter of law it can be said that it was a proximate cause of the collision."

All testimony as to speed consisted of estimates by the various witnesses. In *Kelleher v. Porter,* 29 Wn. (2d) 650, 189 P. (2d) 223, we said:

"In this connection, appellants strenuously argue that, taking the testimony in the aspect most favorable to respondent, the collision could not, as a mathematical proposition, have occurred in the manner asserted by the respondent. This argument is predicated upon the relative distances between the various cars at certain times and places and the various rates of speed at which they were traveling, as testified by respondent's witnesses.

"It is obvious that the testimony with reference to these matters could have been, and was, only an estimate. We are fully satisfied that, from the evidence, considered in the light most favorable to the respondent, the jury could have found, as it obviously did, that the collision was caused proximately and solely by the negligence of the appellant John B. Porter."

Let us carry it a little further. The accident would not have occurred if the train had been on time that morning. The train would then have been resting at the station when the collision occurred. The accident would not have happened had the bus driver speeded up more, or had he stopped. The evidence showed that he could have seen the train, had he looked, at a distance one hundred feet from the track. It would not have happened had the fireman warned the engineer when he first saw the bus approaching. The testimony shows that the Northern Pacific engine passed the rear of the Great Northern engine about three hundred feet from the crossing; that the bus driver started when the Great Northern train passed the crossing; that the fireman first saw the bus when it had just crossed the spur track; that, after the engineer applied the brakes, the train traveled approximately three hundred forty feet before coming to a stop. Couldn't it be said that the proximate

cause of the accident was the failure of the fireman to give immediate warning of the approach of the bus, rather than the speed of the train? That conclusion, of course, could only have been reached in the event that the fireman's failure to immediately warn the engineer constituted negligence.

■ We do not hold that the speed of the train could not have been a proximate cause of the accident. However, that was a question upon which the minds of reasonable men could differ, and it was, therefore, submitted to the jury under proper instructions. We feel that, under all the circumstances of this case, the speed of the train was not, *as a matter of law*, a proximate cause of the accident. The trial court was in error in so holding and in granting a judgment n.o.v.

The trial court granted the motion of the city for a new trial unless the plaintiff (respondent) consented to a reduction of the verdict from ten thousand dollars to four thousand dollars.

Rem. Rev. Stat. (Sup.), § 399-1 [P.P.C. § 78-5], provides:

"If the trial court shall, upon a motion for new trial, find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, the trial court may order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict, and if such party shall file such consent and the opposite party shall thereafter appeal from the judgment entered, the party who shall have filed such consent shall not be bound thereby, but upon such appeal the supreme court shall, without the necessity of a formal cross-appeal, review de novo the action of the trial court in requiring such reduction or increase, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the supreme court shall find from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice."

In *Brammer v. Lappenbusch*, 176 Wash. 625, 30 P. (2d) 947, an appeal from a judgment entered July 31, 1933, im-

mediately after the going into effect of the above statute, this court, in discussing the statute, said:

"The statute does not attempt to limit the inherent power of the court. The form of its language, it will be noted, is permissive, not restrictive. It says that, for certain causes, the court *may* grant a new trial. It does not say that it shall not do so for any other cause. In so far as the amended portion of the statute is concerned, it neither conferred any power upon the court which it did not already inherently possess, nor did it attempt to restrict the court in the exercise of its inherent power. . . .

"It may well be argued that the legislature could not, even if it should attempt to, control or limit the inherent power of the court in this respect. There is respectable authority for such argument and contention, but we are not called upon to decide that question here. It is, at least, the rule in this state, judicially pronounced, that the enumeration of grounds for new trial does not restrict the inherent power of the court to grant a new trial for any other sufficient cause, unless the restriction is expressed."

In *Ticknor v. Seattle-Renton Stage Line,* 139 Wash. 354, 247 Pac. 1, 47 A. L. R. 252, decided prior to the enactment of § 399-1, *supra,* we said:

"Finally, it is claimed that the verdict, as reduced by the trial judge, is excessive, and that it should be still further reduced, and acceptance required by the respondent or a new trial granted. Out of deference to the judgment and discretion of the trial courts, the practice has become settled in this state that it is within the discretion of the trial judge to require an acceptance of a less amount than the verdict, or a new trial will be granted. In the present kind of a case, by its very nature, the amount of damages cannot be fixed with mathematical certainty. Primarily, the jury must be given considerable latitude in fixing the amount. Thereafter, as here, the trial judge in his judgment fixes an amount, which alone stands in the way of the granting of a new trial. The fixing of such an amount by the trial judge has, of itself, the attribute of judgment and discretion, which must be considered by an appellate court as such, and, unless we can see in the amount thus fixed in this case an abuse of discretion, it merits approval."

In 39 Am. Jur. 204, New Trial, § 210, we find the following:

"Where the jury's verdict appears to be excessive, the rights of the parties may be adjusted by either of two remedies: the trial court may order a new trial absolutely or unconditionally; or may require the successful party to remit the excess or, as an alternative, to proceed to a new trial of the case. It is a well-settled general rule that a trial court may make an order denying a motion for a new trial upon the condition that the successful party remit a certain sum from the verdict, even though the amount remaining is not capable of definite computation from the evidence."

■ The trial court, may, therefore, under its inherent power, and in the exercise of its discretion, relieve a party where an injustice has been done in the awarding of an excessive verdict, by either granting a new trial or, in the alternative, by giving the prevailing party the option to accept a smaller amount or submit to a new trial; or it *may,* under § 399-1, *supra,* if it finds the damages awarded by the jury to be so excessive as unmistakably to be the result of passion or prejudice, order a new trial, unless the party affected shall consent to a reduction of the verdict.

A reading of the trial court's memorandum opinion convinces us that it granted a new trial in the alternative under its inherent power, and as an exercise of its discretion, rather than as the result of a finding that the damages awarded by the jury were so excessive as unmistakably to indicate that the amount awarded must have been the result of passion or prejudice. We shall, therefore, review the discretion of the trial court.

■ The respondent suffered severe bruises, many cuts, one on the forehead and one on the mouth; quite a laceration on the inner part of one thigh, and another over one ankle, loss of some teeth, and injuries to two fingers on his right hand. He suffered compound fractures of the two fingers, one of them involving a tendon controlling movement of the fingers. The doctor testified:

"These finger injuries were pretty serious, because we tried to keep them in position so it would heal up with the tendons so it could be controlled, and I think I got a very good result with it."

The respondent testified that he has difficulty in performing his work because of the injury to the nerves of his fingers. His expenses consisted of: hospital bill, $91.75; doctor and dentist bills, $310; loss of wages, tool kit, and clothes, $827, or a total of $1,228.75. Although he was out of work for three months, he has since been back on the job at the same wages. The injuries to his fingers can be corrected by an operation to cost $200 or $250.

The trial court, having the witnesses (especially the respondent) before it, was in a much better position to judge the amount of respondent's damages than we are. We find nothing in the record to indicate an abuse of discretion in reducing the amount to four thousand dollars.

The judgment against the city is affirmed. The judgment against the railway company is reversed.

MALLERY, C. J., BEALS, STEINERT, ROBINSON, and JEFFERS, JJ., concur.

SIMPSON, J. (dissenting)—I agree with the conclusion reached by the majority, except that portion which affirms the trial court's action in reducing the verdict six thousand dollars. To my mind, the amount of ten thousand dollars named in the verdict of the jury was not excessive. My conclusion is based upon the holding in *Atkins v. Churchill*, 30 Wn. (2d) 859, 194 P. (2d) 364, in which case this court stated:

"There should be no distinction in the weight to be given to the verdict of the jury in the assessment of damages for personal injuries and their findings of fact on any other question. The jury heard all the testimony in the cause and doubtless gave credence, as it was the right and duty of the jury to do under the law, to the testimony of respondent Atkins and others with regard to his injuries; and if that testimony is true, the amount of damages which the jury assessed was not excessive."

The verdict of the jury should be approved by this court.

MILLARD, J., concurs with SIMPSON, J.

HILL, J. (concurring in part and dissenting in part)—I would affirm the trial court in every particular; my only

dissent is from the majority's holding that the judgment against the railroad company should be reversed. If the train had been traveling at a speed which would have made it possible to obey the ordinance and cross Spokane street at ten miles an hour, there would have been no collision.

[1]Reported in 198 P. (2d) 678.