[No. 31403.   Department Two.   August 24, 1950.]

BETTY OLSON, *Respondent,* v. HENRY W. WEITZ, *Appellant.*[1]

[1]Reported in 221 P. (2d) 537.

*Cannon, McKevitt & Fraser,* for appellant.

*Jerome Williams,* for respondent.

HILL, J.—Plaintiff, Betty Olson, recovered a verdict for $15,805 against the defendant, Dr. Henry W. Weitz, in a malpractice action, which verdict was reduced by the trial court to $9,805.

The defendant appeals, contending that the plaintiff failed to establish a cause of action and that each of his various challenges to the sufficiency of the evidence should have been sustained. If this relief is denied him, he asks that the case be sent back for a new trial.

No doctor testified for the respondent except the appellant, called as an adverse witness, and he urges that it was incumbent upon her to establish the material allegations of her amended complaint by medical testimony, citing *Fritz v. Horsfall,* 24 Wn. (2d) 14, 163 P. (2d) 148. That rule is sound only when soundly applied. *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Cornwell v. Sleicher,* 119 Wash. 573, 578, 205 Pac. 1059. In *Swanson v. Hood,* 99 Wash. 506, 512, 170 Pac. 135, it is said:

"But there is an obvious distinction between a claim of negligence in the choice of methods of treatment and a charge of negligence in the actual performance of the work or treatment after such choice is made. As to the first, the charge is refuted, as a matter of law, by showing that a respectable minority of expert physicians approved of the method selected, thus taking the case from the jury. As to the second—a charge of negligent performance—where there is any evidence tending to show such negligence the

case is for the jury, as in other cases of negligence, whenever upon the evidence the minds of reasonable men might differ."

■ We have held that some results of medical care and treatment bespeak negligence so plainly that expert testimony is not needed. We have, in effect, applied the doctrine of *res ipsa loquitur* to certain malpractice cases; that is, there are circumstances where it can be said that the result speaks for itself. *Helland v. Bridenstine,* 55 Wash. 470, 475, 104 Pac. 626, 628; *Wharton v. Warner, supra; Cornwell v. Sleicher, supra.* The question is whether the present case falls within that category.

July 19, 1947, the respondent went to the appellant for treatment of a simple transverse greenstick fracture of the radius of her left forearm. The arm was placed in a cast on that date. The cast was removed on August 26, 1947, and the condition of the arm on that date, at the time respondent left appellant's office, is, in our opinion, the pivotal fact in this case.

August 28, 1947, respondent consulted Dr. Alfred O. Adams, who, after an examination of her arm, called appellant and reported a marked displacement of the radius and that an open reduction would probably be required.

September 2, 1947, she returned to appellant's office, at his request. He concedes that on that date the fractured bone was not in alignment, that her arm was in such condition that further treatment was necessary, and that an open reduction was the proper treatment for the condition then existing. It is undisputed that the situation was corrected by an open reduction and bone graft, bone being taken from respondent's left leg.

If respondent's arm was in the same condition on August 26th, when she left appellant's office, that it was on September 2nd when she returned (leaving out of consideration the effect of a fresh fracture, of which more anon)—and she testified that it was—a *prima facie* case of malpractice seems to us sufficiently established without expert testimony.

Appellant testified that on August 26th, when the cast was removed, he felt that he had achieved a satisfactory result in the reduction of the fracture. He said:

"Well, it was naturally stiff at the elbow from lack of use. However, she could bend it down, at least in this much of an angle (indicating), and the skin, of course, was shrunken and scaly and looked dirty, which was natural. I mean, all look that way, and the appearance of the arm looked natural, and I felt across this fracture, and you could just barely feel an observable mass, but if you were not looking for it you couldn't see it."

He testified further that he fluoroscoped the arm at that time, and that the fragments were in good alignment and "There was a callus formation or calcium deposit present, and it showed union of the bones."

Donald L. Royer, who was employed by appellant at that time as a general technician for laboratory and X-ray work, was present when the arm was fluoroscoped before the cast was removed, and appellant showed him the position of the bones and pointed out that they were in good alignment. Unfortunately for appellant if the situation was as he and Mr. Royer testified, no X rays were taken at that time.

Respondent testified that when the cast was removed she immediately noticed that her arm was crooked and had a lump projecting about one inch from the top of the arm where it was fractured, and that the lump extended in a tapering manner for three inches along the top of the arm. She was alarmed at the appearance of the arm, but appellant said that the lump would disappear within three months.

Five other people testified as to the condition of respondent's arm on August 26th. Avis Nagle, whom she met a few blocks from the doctor's office, immediately noticed the bump on respondent's arm. She described it as extending about one inch above the normal level of the arm and tapering about three inches along the arm. Mr. and Mrs. E. E. Nagle, the parents of Avis Nagle, with whom the respondent was living at that time, and Mr. and Mrs. W. A. Pangburn saw the arm and described its crookedness and the bump or hump on its upper surface. There was testimony that the

respondent appeared to be greatly upset and unable to use the arm at all.

Such was not the result to be expected from proper treatment of a simple fracture with no complications, and appellant does not contend that it was. His testimony, corroborated by a pharmacist who assisted him in setting the arm and by the X-ray and laboratory technician, was sufficient, if believed, to establish proper treatment and a satisfactory result. He sought to show that a fall probably caused the misalignment reported by Dr. Adams on August 28th and shown by appellant's X rays taken on September 2nd. The issue as to the condition of the arm on August 26th became strictly one of veracity.

■ The jury was entitled to accept the version of the respondent and her witnesses. If her version is true, the result of the treatment was palpably a bad one within the rule of the cases heretofore referred to. We conclude that there was sufficient evidence, without expert testimony, to take respondent's case to the jury and to sustain a verdict for the respondent.

The appellant urges that, even if there was a case for the jury, he is entitled to a new trial. His assignments of error involving instructions Nos. 4 and 8 raise the question heretofore disposed of, relative to the necessity for expert testimony. The assignment of error involving instruction No. 12 raises a question that requires the consideration of certain evidence.

■ There was evidence that the X rays taken by appellant on September 2nd showed a very recent refracture—within three or four days—according to the testimony of one doctor. Respondent denied any fall or circumstance that could have caused a refracture. Appellant introduced evidence of falls by respondent at a roller skating rink both before and after the cast was removed. There was no conclusive showing that the refracture, if any, caused the misalignment or that it in any way augmented the damages sustained in consequence of the misalignment.

Instruction No. 12 told the jury that, if it found that at the time of the refracture, if any, the respondent's arm was already in such condition of misalignment as to necessitate the open reduction and bone grafting operation performed by Dr. Adams, the respondent was entitled to such damages as she had sustained by reason of the necessary performance of that operation. The instruction was proper because, if the operation was necessary regardless of a refracture (and there was evidence to justify the conclusion that it was), respondent was entitled to the damages indicated in the instruction.

Instruction No. 15 related to damages. Appellant particularly complains that there was no evidence to warrant that portion thereof which instructed the jury that in arriving at the damages to be awarded it should consider ". . . the pain and suffering, if any, she will with reasonable certainty endure in the future; and whether such injuries are permanent in character and her future condition, as a result of such injuries."

The instruction was a correct statement of the law if there was any evidence to make it applicable.

Respondent testified that at the time of the trial, in April, 1949, which was about seventeen months after the operation by Dr. Adams, she had continuing pain in her arm, that the arm became swollen at the wrist with use, that she had to bathe the arm every day at noon and again at night to relieve the swelling and pain, and that the area adjacent to the operative scar on her leg was very sensitive.

The only doctor who examined the respondent after the operation by Dr. Adams was Dr. Thomas D. Thompson, who made his examination on March 12, 1949, a month before the trial. He testified that Dr. Adams had achieved an excellent result and that he felt that there was no permanent disability or injury to the arm, and that he could find no objective evidence to explain the pain of which respondent complained in her arm or of the tenderness of which she complained in the area of the operative wound in the leg, made to secure bone for the bone graft.

█ Dr. Thompson's testimony that he could find no objective evidence to warrant the pain and suffering was to be weighed by the jury but was not conclusive. In *Suprunowski v. Brown & White Cab Co.*, 142 Wash. 65, 68, 252 Pac. 155, the plaintiff had·suffered severe bruises and sprains of the hip and shoulder, and we said:

"The rule in this court, particularly in an injury of this character, is that where the testimony shows that the plaintiff still suffers at the time of the trial, the court is justified in submitting .to the jury the matter of future pain and suffering."

█ That respondent had operative scars on her arm and leg was a matter to be considered by the jury under the category of permanent injuries. Respondent also testified that, at the time of the trial, she had only twenty-five to thirty-five per cent of the ability to grasp with the fingers of her left hand that she had prior to the injury, that she had about fifty per cent of her normal ability to lift with her left arm, and that there had been no improvement in these conditions during the year preceding the trial.

Dr. Thompson, appellant's witness, testifying as to the result of his examination a month before the trial, said that there was some weakness in both the left hand and the left arm, although, as indicated heretofore, it was his feeling that there was no permanent injury. The appellant also relies upon the evidence that, subsequent to February 1, 1948, the respondent lost no time from her work as a Burroughs posting machine and comptometer operator.

The following quotation from *Payne v. Whatcom County R. & Light Co.*, 47 Wash. 342, 346, 91 Pac. 1084, seems pertinent:

"It is also claimed that the court erred in submitting to the jury the question of permanent injuries and in giving instructions in regard thereto, for the reason that there was no testimony tending to show permanent injuries. The weakness of this contention lies in the fact that there was some testimony tending to prove permanent injury. It is true that the testimony of the physicians called as expert witnesses probably did not sustain this contention, but the testimony of the plaintiff Millie Payne and her co-respond-

ent, her husband, Thomas Payne, and the testimony of other of the plaintiffs' witnesses does sustain it. The testimony of expert witnesses is not exclusive, and does not necessarily destroy the force or credibility of other testimony. The jury has a right to weigh the testimony of all the witnesses, experts and otherwise, and the same rule applies as to the weight and credibility of such testimony."

We find no error in the instruction submitting to the jury the question of the extent of the future pain and suffering and the permanent injury sustained.

But the evidence which warranted the instruction did not warrant the verdict of fifteen thousand dollars, which must have been predicated to a considerable extent upon future pain and suffering and the permanent disability. The evidence as to the character and extent of the injury, the pain and suffering, past, present and future, and any possible permanent injury could not justify a verdict in that amount.

The really critical question in this case is what should have been done concerning the patently excessive verdict for fifteen thousand dollars for general damages, which was reduced by the trial court to nine thousand dollars, with the consent of the respondent, as an alternative to the granting of a new trial.

Appellant asks for a new trial because the verdict was so excessive as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice; while the respondent, relying upon Rem. Rev. Stat. (Sup.), § 399-1 [P.P.C. § 78-5], asks that the verdict for fifteen thousand dollars be reinstated.

The trial court made a specific finding that the verdict was not the result of passion or prejudice. That court was in a much better position than we are to determine whether passion or prejudice had influenced the verdict, and we do not feel justified in disagreeing with its findings or with its refusal to grant a new trial.

The trial court was proceeding, not under the statute relative to the granting of new trials where passion or prejudice is unmistakably indicated (Rem. Rev. Stat.

(Sup.), § 399 [P. P. C. § 78-3] *et seq.*), but under the inherent power of the court to grant a new trial where the damages are so excessive that substantial justice has not been done, or to require the successful party under such circumstances to remit the excess as an alternative to the granting of a new trial. *Brammer v. Lappenbusch,* 176 Wash. 625, 30 P. (2d) 947; *Nagle v. Powell,* 5 Wn. (2d) 215, 223, 105 P. (2d) 1; *Scobba v. Seattle,* 31 Wn. (2d) 685, 699, 198 P. (2d) 805. The amount of nine thousand dollars for general damages seems generous to us, but, as said in *Scobba v. Seattle, supra,* (p. 700):

"The trial court, having the witnesses (especially the respondent) before it, was in a much better position to judge the amount of respondent's damages than we are."

■ Respondent's request for the reinstatement of the jury's verdict under the provisions of Rem. Rev. Stat. (Sup.), § 399-1, is without merit because that statute applies only when

". . . the trial court shall . . . find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice. . . ."

In the present case, as has been stated, we have a finding by the trial court that, although the verdict was excessive, it was not the result of passion or prejudice.

The misconduct of counsel in three particulars is urged as warranting a new trial. Since we are of the opinion that the trial court corrected all of the errors by promptly sustaining the objections thereto and by instructions to disregard where such instructions were appropriate, we will not set out the instances of misconduct of which complaint is made. Experience has indicated that each questionable bit of conduct set out in our reports and condoned as not being sufficiently prejudicial to justify a new trial, establishes for some few members of the bar a new outpost from which to operate, as having been marked upon the legal map as within the frontier which separates misconduct from prejudicial error. We should, however, say

that the reference to an insurance adjuster by one of appellant's own witnesses was apparently inadvertent, and that neither the attorney nor the witness deliberately, wilfully or collusively injected the matter into the record. See *Williams v. Hofer,* 30 Wn. (2d) 253, 191 P. (2d) 306.

The judgment in the sum of $9,805 is affirmed.

SIMPSON, C. J., ROBINSON, MALLERY, and HAMLEY, JJ., concur.