673 P.2d 1318

Janice **TOPPINO**, Plaintiff-Appellee, Cross-Appellant,

v.

Frank F. **HERHAHN**, M.D., Defendant-Appellant, Cross-Appellee.

No. 5912.

Court of Appeals of New Mexico.

May 10, 1983.

James R. Toulouse, Lawrence W. Allred, Toulouse, Toulouse & Garcia, P.A., Albuquerque, for plaintiff-appellee, cross-appellant.

Bruce Hall, Debra Romero Thal, Ellen G. Thorne, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendant-appellant, cross-appellee.

## OPINION

HENDLEY, Judge.

Plaintiff filed suit against defendant for damages arising from plastic surgery to reconstruct her right breast. Damages were claimed under three theories: 1) medical malpractice; 2) breach of express or implied warranties; and 3) lack of informed consent. Plaintiff abandoned the theory of lack of informed consent. The trial court directed a verdict in favor of defendant on the negligence issue. The jury returned a $27,500 verdict for plaintiff on the warranties issue. Defendant appeals the jury verdict. Plaintiff appeals the directed verdict on the negligence issue.

Following a modified radical mastectomy, plaintiff underwent reconstructive surgery. Defendant is a board certified specialist in plastic and reconstructive surgery. He performed five operations on plaintiff in an attempt to achieve the objective of giving her a reconstructed breast which would be reasonably symmetrical to the natural breast when she was dressed.

The first operation resulted in an implant which was located higher and smaller in size than the natural breast. Defendant admitted that this was a poor result.

The second operation resulted in a lower and larger implant. This subpectoral implant had an appearance of being "smashed." Defendant told plaintiff that he could improve on the result. They decided to use a different type prosthesis, a "teardrop," which more closely resembles the shape of a natural breast.

In the third operation the prosthesis was placed subcutaneously. Both plaintiff and defendant were satisfied with the result. Shortly thereafter, plaintiff began to have problems with the reconstructed breast. Defendant diagnosed her problems as a "rapid capsular contracture," a build up of scar tissue.

A fourth operation was undertaken to alleviate this problem. Defendant removed the prosthesis and cut through the scar tissue to relieve the compression it had caused. During reinsertion the prosthesis "ruptured spontaneously." Defendant replaced the teardrop prosthesis with a round one from his stock. Plaintiff understood this to be temporary until defendant could get another teardrop prosthesis. Defendant testified that he intended it to be permanent if it did the job. This implant drifted, resulting in an undesired effect.

In the fifth surgery a teardrop prosthesis was implanted. While still in the operating room, plaintiff examined the breast and was very dissatisfied. The implant was located too low and too far to the side. It did not resemble a breast in size, shape, or consistency. Plaintiff expressed her dissatisfaction. She was told the room was needed for another surgery.

Prior to each surgical procedure plaintiff signed a Permission for Operation and Surgical Permit. The Permission for Operation contained the following language: "I am advised that though good results are expected, they cannot be and are not guaranteed, nor can there be any guarantee against untoward results." Plaintiff testified that she read and understood the permission and the permit before signing.

*The Appeal—Express Warranty*

Defendant argues that the express warranty issue was improperly before the jury. He contends that: 1) in light of the surgical consent form, which he claims was conclusive evidence as to any express warranty, the extrinsic evidence considered by the trial court was incompetent; and 2) there was insufficient evidence of express warranty for a particular surgical result to go to the jury.

■ The first contention was not raised before the trial court. Defendant did not raise a defense to the warranty claim based on the conclusiveness of the consent form in his answer. He did not object to the extrinsic evidence when it was elicited from plaintiff at trial. The theory was not relied on in arguing the motions for a directed verdict. Matters not brought to the trial court's attention cannot be raised for the first time on appeal. *Albuquerque Prod. Credit Ass'n v. Martinez,* 91 N.M. 317, 573 P.2d 672 (1978).

Defendant's second contention is based on the theory that his words "we'll get this right" and "this will be right" were merely words of reassurance and did not form a basis of the bargain. Defendant also contends that plaintiff failed to show reliance on the warranty. He relies on *Stang v. Hertz Corporation,* 83 N.M. 217, 490 P.2d 475 (Ct.App.1971), *rev'd in part on other grounds,* 83 N.M. 730, 497 P.2d 732 (1972), for the proposition that the words did not form a basis of the bargain. In *Stang, supra,* after a contract for a rental car had been signed the agent for Hertz stated "you have got good tires." The Court of Appeals found the statement to be outside the basis of the agreement and not sufficient evidence of express warranty to go to the jury.

In the present case, the statements arose in a context different from that in *Stang, supra.* Here, the statements were made after and before each of the several operations. There was evidence that these statements became part of the basis of the bargain. Plaintiff testified that as time went on she was beginning to lose faith in defendant but allowed him to continue based on his statements.

■ The trial court properly refused to direct a verdict on the issue of express warranty. Defendant's argument that these statements must be closely scrutinized, relying on cases that say statements of opinion and reassurance by physicians do not constitute express warranties, is without merit. The jury could have properly found an express warranty existed.

### The Appeal—Implied Warranty

Defendant argues that it was error to instruct on an implied warranty. We agree.

■ Generally, when entering into a professional services contract a physician impliedly warrants only that he possesses and will employ that degree of skill, care, and learning possessed and exercised by others in the profession. An express warranty of particular result would be required in order to find that more than the above was warranted. *See State, Etc. v. Gathman-Matotan, Etc.,* 98 N.M. 790, 653 P.2d 166 (Ct.App. 1982); *Gault v. Sideman,* 42 Ill.App.2d 96, 191 N.E.2d 436 (1963).

Plaintiff argues, however, that this case should not be controlled by those cases finding that there can be no implied warranties in cases involving professional services contracts. She contends that this is a question of first impression in New Mexico in that it involves an implied-in-fact warranty brought into effect by the course of conduct of the parties; *i.e.,* that the context here is somehow different in that there was a series of operations and the statements were of a continuing nature, building in importance with time.

■ We disagree. By definition an implied contract is an agreement in which the parties by a course of conduct have shown an intention to be bound by the agreement. *See* NMSA 1978, UJI Civ. 8.3 (Repl.Pamph. 1980). This is what plaintiff tried to prove. However, we will not recognize a cause of action based on implied warranty for particular result in the professional services contract area. *See Gathman-Matotan, supra.*

### The Cross-Appeal

Plaintiff argues that the trial court erred in directing a verdict for defendant on the negligence issue. At trial, the expert did

not testify that defendant had been negligent. In fact, he testified that defendant's actions were within the acceptable realm of their profession.

■ Generally, expert testimony of medical malpractice is required to make a prima facie case. *See Gerety v. Demers,* 92 N.M. 396, 589 P.2d 180 (1978). There is, however, a "common knowledge" exception to this expert witness rule. *See Pharmaseal Laboratories, Inc. v. Goffe,* 90 N.M. 753, 568 P.2d 589 (1977).

It is not mandatory in every case that negligence of the doctor be proved by expert testimony which shows a departure from reasonable standards of care. Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential. (Citations omitted.) Such evidence includes lay testimony regarding non-technical mechanical acts by the physician * * *.

■ Such is not the case here. The acts involved here are not non-technical mechanical acts by the physician. The questions of subpectoral v. subcutaneous placement, the shape and volume of the prosthesis, saline v. gel, the effect on the prosthesis caused by various muscle and skin elasticities is "peculiarly within the knowledge of doctors" and not "common knowledge ordinarily possessed by an average person." The fact that a lay person can recognize an undesired result may be evidence of breach of warranty for a particular result, but it is not, in a case of this nature, evidence of medical malpractice.

■ Plaintiff also claims the trial court committed error by refusing to allow her to question the expert on his involvement in the New Mexico Physician's Mutual Liability Company in order to show his statements on negligence were not conclusive because of his bias. The directed verdict was not error. Assuming, but not deciding that this evidence would have made his statements on negligence inconclusive, it does not follow that a directed verdict would be error. Plaintiff failed to produce expert testimony of medical malpractice. The common knowledge exception does not apply. Under these facts, without expert testimony of negligence, the directed verdict was correct.

Since the jury was instructed on an express or implied warranty theory, we cannot determine upon which warranty relief was granted. Accordingly, the judgment in favor of plaintiff is reversed. The cause is remanded for a new trial. The theory of implied warranty will be excluded, as will the negligence theory. *Perfetti v. McGhan Medical,* 662 P.2d 646, 22 SBB 435 (N.M.Ct. App.1983). Plaintiff is assessed costs. NMSA 1978, Civ.App.R. 27(a).

IT IS SO ORDERED.

NEAL, J., concurs.

WALTERS, C.J., concurs in part, dissents in part.

WALTERS, Chief Judge (concurring in part, dissenting in part).

1. I agree with the majority's discussion on express warranty. I agree, also, with the result reached on implied warranty because of *stare decisis,* but not by reason of any rationale which purports to support the rule that professional services contracts are not subject to an implied warranty of a particular result. As a firm rule of law, I see no reason why a professional, be he doctor or lawyer or architect, should be exempt from the doctrine of implied contract arising from a course of conduct if facts exist showing such a course of conduct as would trigger the doctrine. *See* U.J.I. Civ. 8.3 (Repl.Pamp.1980); *Trujillo v. Chavez,* 76 N.M. 703, 417 P.2d 893 (1966). In my opinion, it is one thing to say that in a

specific case the evidence does not support a finding of such an implied warranty; quite another thing to say that we will not recognize such a cause of action against a professional. If the rule regarding professionals to which I object is correct, obviously I have been wrong for many years in my apprehension of what is meant by "equal protection of the law," "equal justice under the law," and "uniform application of the law."

2. The majority says that the negligence issue was properly withdrawn from the jury because expert medical evidence was required to show negligence on "questions of subpectoral v. subcutaneous placement, the shape and volume of the prosthesis, saline v. gel, the effect on the prosthesis caused by various muscle and skin elasticities."

The only attack made by plaintiff was whether the defendant exercised the degree of skill and care to be expected in defendant's selection of the size of the various prostheses inserted, and the places of insertion. She did not challenge his technical medical abilities or his medical procedures. In the perhaps more commonly understood vernacular a la Al Capp, she asserts that, "as any fool can plainly see," a breast implant should be relatively the same size and in the same location as its counterpart when done by one who holds himself out as a specialist in that field of medicine.

None of us would have any difficulty in agreeing that a roofer who undertakes to repair a leaky roof can be held liable for negligent repairs if the house is flooded during the next rain. *Cochrell v. Hiatt,* 97 N.M. 256, 638 P.2d 1101 (Ct.App.1981). "Where a person is employed in work of skill, the employer buys both his labor and his judgment; he ought not to undertake the work if he cannot succeed, and he should know whether it will or not." *Andriola v. Milligan,* 52 N.M. 65, 191 P.2d 716 (1948).

The law of medical malpractice correctly makes a distinction between results obtainable when one's skill is being applied to the human body with all of its individualistic peculiarities, and when applied to an inanimate property. But if a dentist were to replace a tooth by attaching it to the roof of the patient's mouth, no one would suggest that a layman is incapable of determining that a tooth does not belong on the roof of the mouth. In my view, it should be equally ascertainable to a layman that a surgeon does not place a breast implant almost under the arm, or inches above or below the line of the remaining breast, nor does he balance a grapefruit on one side with a lemon or a deflated balloon on the other. The rule that negligence of a physician through his departure from the standards of practice must be established by medical testimony is sound only when soundly applied. *Olson v. Weitz,* 37 Wash.2d 70, 221 P.2d 537 (1950).

It is well settled that a cause of action in contract is separate from malpractice, and that both actions may arise out of the same transaction; but they are not mutually exclusive. *Noel v. Proud,* 189 Kan. 6, 367 P.2d 61 (1961); *Stewart v. Rudner,* 349 Mich. 459, 84 N.W.2d 816 (1957); *Robins v. Finestone,* 308 N.Y. 543, 127 N.E.2d 330 (1955); *Colvin v. Smith,* 276 App.Div. 9, 92 N.Y.S.2d 794 (1949). I am concerned that courts have long indulged in a highly technical but rationally indefensible protection of professional conduct. I do not think it an impossible step nor an illogical progression to reason that one who expressly holds himself out as capable of achieving a specific result—and the majority opinion approves the theory in this case of express warranty—may be found by a jury to have improperly performed "the duties imposed on him by reason of the professional services undertaken." *Noel v. Proud, supra,* at 367 P.2d 66. *Noel* instructs that such "improper performance" of services, whether undertaken "under a contractual relationship with the patient arising out of either an express or implied contract of employment or the obligation imposed by law under a consensual relationship, whereby the patient is injured in body and health for which he seeks damages, is malpractice." *Id.* at 66. *Stewart v.*

*Rudner, supra,* elucidates that mental anguish and distress are included in the types of injury for which a patient may seek redress in a case claiming improper performance by the physician. One who warrants that he has the skill to "get it right" must, it seems to me, have removed himself from the standards of "ordinary" skill, competence, care and treatment by which his performance normally would be judged, so that medical evidence of the usual standards in the community is no longer relevant. At that point, he subjects himself to a determination by laymen, at least as to size and placement of a breast implant, whether he "got it right." *Cf. Eis v. Chesnut,* 96 N.M. 45, 627 P.2d 1244 (Ct.App. 1981).

The law of medical malpractice stated in the majority opinion, *i.e.,* that the complaints raised by plaintiff are technical questions peculiarly within the knowledge of doctors, differing from my perception of the law or what it should be, I respectfully dissent on that issue.

3. Although plaintiff's next issue is tied to a point on appeal attacking the directed verdict, the majority opinion does not address her claim that she was not permitted to show bias on the part of the expert medical witness. The argument was made that the doctor testifying to defendant's adherence to the community medical standards was a health care provider as defined in the Medical Malpractice Act, §§ 41–5–1, *et seq.,* NMSA 1978 (1981 Repl.Pamp.). Under the Act, health care providers are subject to assessment for a surcharge if the Patient Compensation Fund is called upon to pay a portion of a malpractice judgment not covered by the defendant doctor's personal insurance. The Fund is replenished by annual surcharges against all participating doctors. Plaintiff sought to question the expert to show a personal basis for his providing evidence favorable to defendant so that his own exposure to a surcharge would be minimized. The trial court, concerned "about the insurance issue," refused to permit the questions.

Although it has been said that evidence of the existence of insurance may be grounds for a mistrial if calculated to influence the verdict of the jury, *Falkner v. Martin,* 74 N.M. 159, 391 P.2d 660 (1964), later cases have recognized that N.M.R. Evid. 411, N.M.S.A.1978, expressly permits evidence of insurance when offered for some other purpose than that one is insured against liability. *See e.g., Martinez v. Teague,* 96 N.M. 446, 631 P.2d 1314 (Ct.App. 1981); *Selgado v. Commercial Warehouse Co.,* 86 N.M. 633, 526 P.2d 430 (Ct.App. 1974). In *MacTyres, Inc. v. Vigil,* 92 N.M. 446, 589 P.2d 1037 (1979), where the trial court refused to allow mention of insurance in a witness's testimony, our supreme court held that "[t]he right to impeach a witness is basic to a fair trial," and the witness's credibility could have been seriously affected had the jury been aware of some facts related to the insurance issue. The jury verdict was reversed. So it is in this case; the trial court should have allowed plaintiff to question the witness regarding his monetary interest in the outcome of the case, which attached by reason of the possibility that he would be required to contribute to the Patient Compensation Fund.

I would reverse for trial by jury on the malpractice issue as well as for the reason stated by the majority.