[No. 30641.   Department One.   February 7, 1949.]

JOSEPH YURICK, *by John J. Kennett, his Guardian ad Litem,*
*Appellant,* v. WILLIAM COWEN McELROY, *Defendant,*
FARMERS AUTOMOBILE INTER-INSURANCE EXCHANGE,
*Respondent.*

HERMAN HOWE *et al., Appellants,* v. FARMERS AUTOMOBILE
INTER-INSURANCE EXCHANGE, *Respondent.*[1]

*John J. Kennett* and *Lycette, Diamond & Sylvester,* for appellant.

*Bayley, Fite, Martin & Shorts* and *Jo. D. Cook,* for respondent.

BEALS, J.—During the month of January, 1946, Mrs. Grace Buchanan was the owner of a Plymouth sedan and, in connection with the use of the car, was protected by a

[1]Reported in 202 P. (2d) 464.

five-thousand-dollar policy of insurance, written by Farmers Automobile Inter-Insurance Exchange (herein referred to as the insurer or respondent), which was in effect at all times herein referred to. Mrs. Buchanan resided in Seattle, on Sixteenth avenue southwest. Her young daughter, Doris Buchanan, resided with her. William C. McElroy, who, at the date referred to, was seventeen years of age, was a friend of Miss Doris (the two young people subsequently intermarried), and was a frequent visitor at Mrs. Buchanan's home.

January 1, 1946, Joseph Yurick, a minor, was a passenger in an automobile, driven by one Nickert, which was proceeding east along the elevated Spokane street viaduct, when the left rear tire suddenly became deflated. The car was stopped close to the right-hand curb, and Yurick and Nickert left the automobile to examine the tire. McElroy was then driving the automobile belonging to Mrs. Buchanan in an easterly direction along the viaduct. He so operated the automobile as to strike Yurick, inflicting upon him serious and permanent injuries.

Yurick, by his guardian *ad litem*, instituted an action against McElroy, by Lycette, Diamond and Sylvester, his attorneys. The defense of the action was seasonably tendered to Mrs. Buchanan's insurer, the tender having been refused. Trial of the action resulted in a judgment in Yurick's favor in the sum of $14,950. In aid of the judgment, a writ of garnishment was issued by plaintiff, directed to Mrs. Buchanan's insurer above named, which answered the writ, denying that it was indebted or obligated to McElroy in any sum whatsoever. The allegations in the answer were controverted by an affidavit filed on plaintiff's behalf.

The attorneys who represented McElroy in the damage suit rendered him a bill for one thousand dollars for their services in defending the action, and assigned their claim to Herman Howe, who, together with McElroy as joint plaintiff, instituted an independent action against Mrs. Buchanan's insurer, alleging in the complaint Mrs. Buchanan's ownership of the automobile, the issuance by the insurer of the policy in Mrs. Buchanan's favor, and

alleging other facts which, it was contended, rendered the insurer liable to plaintiff's assignors. The two actions were consolidated by order of the superior court. The trial thereof before a jury resulted in verdicts against the insurer, one verdict being in favor of the plaintiff and against the garnishee defendant (the insurer), and the other being in favor of the plaintiffs Howe and McElroy and against the insurer, in the sum of $705.50. The insurer interposed motions for judgment in its favor notwithstanding the verdicts or, in the alternative, for a new trial, which motions the trial court granted, identical orders being entered as to each verdict, the verdicts being set aside. The orders further provided that, if the orders should be reversed, a new trial should be granted because of an error referred to in the orders.

Thereafter, a judgment of dismissal with prejudice was entered in each action, from which judgments separate notices of appeal were given and cost bonds filed in support thereof.

By stipulation, by all parties concerned, it was agreed that the two proceedings had been consolidated for trial before the superior court, that they were tried upon the same evidence, that the plaintiffs had appealed to this court from the adverse judgments rendered, and that, as the issues involved on the appeals were identical, it was stipulated that the two actions be consolidated before this court for purposes of appeal. After the filing of the appeals, an order was entered by this court, consolidating the actions for hearing for all purposes, directing that one transcript and one statement of facts be filed and that the matter be presented on consolidated briefs.

Appellants assign error upon the granting of the judgments entered notwithstanding verdicts of the jury, upon the granting of new trials in the event of reversal of the orders granting judgments as above, and upon the entry of the judgments of dismissal.

The policy issued to Mrs. Buchanan by the insurer contains the following paragraph:

"III.              DEFINITION OF 'INSURED'

"The unqualified word 'insured' wherever used in coverages A and B and in other parts of this policy, when applicable to such coverages, includes the named insured and, except where specifically stated to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is with the permission of the named insured. The insurance with respect to any person or organization other than the named insured does not apply: . . ."

The foregoing paragraph was followed by four explanatory exceptions which are not here pertinent. Appellants argue that, under the evidence disclosed by the statement of facts, respondent is liable to appellant Yurick up to the limit of the protection of the insurance, and also liable, under the policy, to appellant Howe.

If appellants are to prevail in this action, it must be determined that McElroy's operation of the automobile, on the day and at the time of the accident, falls within the proviso in the paragraph of the policy above quoted and that the actual use of the automobile by McElroy was with the permission (express or implied) of Mrs. Buchanan, the named insured.

The evidence concerning this question is contained in the testimony of McElroy, Mrs. Buchanan, and Doris Buchanan McElroy.

The testimony may be summarized as follows: During the evening of December 31, 1945, Mrs. Buchanan entertained a large number of her friends. Her son, Donald, who was serving in the navy, and several of his shipmates, were present and, during the evening, many friends of the family called. After greeting the New Year the guests departed, and there were then present Mrs. Buchanan, McElroy, Mrs. Buchanan's daughter, Doris (who, at the time of the trial, was McElroy's wife), her son, Donald, and two or three of his shipmates, and Bob Garvin, a friend of McElroy.

Donald was required to report at his ship by seven o'clock a. m., and asked that Mrs. Buchanan's car take him and

his mates to the ship. It was agreed that McElroy would drive the car, and the group, consisting of McElroy, Garvin, Miss Doris, her brother, and his friends, left the Buchanan home to take the sailors to their destination. After leaving Donald and his friends at their ship, McElroy was to drive Miss Doris to her home. From the record it does not clearly appear whether permission to use the car was obtained from Mrs. Buchanan by Miss Doris or her brother, but it appears that one or the other of these two obtained Mrs. Buchanan's permission to use the car for the purpose mentioned.

After proceeding a short distance, the automobile stalled, and all efforts to induce it to proceed were fruitless. The car was locked and parked on the street. Donald and his friends obtained other transportation, Miss Doris and McElroy returned on foot to the Buchanan house, and Garvin went to his brother's home.

When McElroy and Miss Doris reached the latter's home, Mrs. Buchanan had retired. Miss Doris at once reported the incident to her mother, McElroy, standing nearby, overhearing some or all of the conversation between Miss Doris and her mother. From the evidence, it appears that Mrs. Buchanan agreed that McElroy should retain the keys to the car and later in the day attempt to get the car running and return it to Mrs. Buchanan. McElroy then, at some early hour in the morning not stated in the record, left and went to his father's home, which, apparently, he reached some time prior to six o'clock a. m. Before noon that day, he and his brother-in-law, Bob Carlson, proceeded to the Buchanan car, which they placed in operation. McElroy then drove the car to his father's home.

While McElroy was at Mrs. Buchanan's, after returning with Miss Doris from the disabled car, it does not appear that any precise time was agreed upon for the return of the car to Mrs. Buchanan's home. There was some testimony to the effect that McElroy would take the car to Mrs. Buchanan after he finished working. Apparently, it later developed that he was not required to work New Year's day. Sometime early in the afternoon he proceeded to

drive Mrs. Buchanan's car on projects of his own. He drove to an establishment where intoxicating beverages were sold and drank some liquor. He then drove to a friend's home for a social visit, in the course of this trip passing within two or three blocks of Mrs. Buchanan's home. While visiting his friend, it was decided that McElroy would drive to another part of the city and pick up a radio and bring it to his friend's house. While starting on this expedition, McElroy again passed within two or three blocks of the Buchanan home. Thereafter, while on the way to pick up the radio, the accident occurred which resulted in Yurick's injuries.

At all times after noon, January 1st, McElroy was the sole occupant of the car, and at no time was he engaged on any errand for Mrs. Buchanan or any member of her family, nor does it appear from the record that Mrs. Buchanan knew that he was driving the car for his own pleasure.

McElroy testified that, during December, 1945, he and Miss Doris were "engaged," and it appears that after October he had driven the car ten or a dozen times, sometimes to go to the theater with Miss Doris, or merely to enjoy a ride with her. Apparently, permission for McElroy to use the car on these occasions was always obtained from Mrs. Buchanan, generally, if not always, by her daughter. On at least one occasion he drove Mrs. Buchanan on a shopping tour, and on another he drove the car from the house to pick up Mrs. Buchanan at her place of employment and drive her home. Apparently, the only time McElroy drove the car without a member of the Buchanan family being present was the occasion last mentioned, when he drove alone from the Buchanan home to meet Mrs. Buchanan.

The record contains some reference to an occasion when McElroy may have been permitted to use the car for his own convenience, but as to this the record is confused.

Over appellants' objection, McElroy testified that he had "access" to another car.

The question here presented is: Was McElroy, January 1, 1946, at the time of the accident, using Mrs. Buchanan's automobile for his own purposes with Mrs. Buchanan's permission, direct or implied, thereby making McElroy an additional insured under Mrs. Buchanan's policy of insurance which had been executed in her favor by respondent? If, under the terms of the policy and the law applicable to the question here presented, McElroy was, at the time of the injury to appellant, an insured within the terms and provisions of the policy, the judgments appealed from should be reversed. If he was not, at that time, such an insured, the judgments should be affirmed.

The record discloses no basis whatever for a holding that Mrs. Buchanan, in direct terms, granted McElroy permission to use her automobile for any purposes of his own during the course of the day of the accident. When the matter was discussed with Mrs. Buchanan, very early on the morning of that day, it appears to have been believed by Mrs. Buchanan and her daughter that McElroy would be working during the day. Apparently, McElroy was not required to work, and, during the afternoon and up to the time of the accident which resulted in Mr. Yurick's injury, McElroy was using the car entirely for his own pleasure. The testimony discloses that Mrs. Buchanan did give McElroy permission, and indeed desired him, to get the car in operation and return it to her home. No time was fixed for carrying this into effect, nor were any specific instructions given as to how it should be accomplished. McElroy did not know what was wrong with the car; it might merely have been out of gas, while, on the other hand, there might have been something more serious wrong with it. It developed that, when the car was placed in motion by pushing it, it functioned as usual.

McElroy testified that, when the car broke down, he had arranged with Bob Garvin, a member of the party, to use the latter's car to tow the Buchanan car to its home if, later on in the day, it developed that the car could not be operated. McElroy testified that, according to the arrange-

ment made early in the morning, he should have returned the car immediately to Mrs. Buchanan's home. He further testified that, when he later drove the car to see his friend, passing near the Buchanan home, he was driving strictly for his own pleasure, and that, again, when he drove to pick up the radio for his friend, the trip was simply to accommodate the friend and himself, and for no other purpose.

It may be noted that the occasion for the expedition early on the morning of January 1st was the convenience of the Buchanans, namely, taking Mrs. Buchanan's son and his friends to their ship. The trip was in nowise concerned with the pleasure or convenience of McElroy, and the car was not loaned at his request or for his benefit. Had the car then been loaned to McElroy to use for some purpose of his own, it might be argued that, unless especially revoked, the permission granted continued, in effect, until the later hour when McElroy was to attempt to reactivate the car. This element, however, is completely lacking.

The delivery of an automobile by the owner to a friend, to accomplish a particular mission for the owner, would not, ordinarily, without the granting of further permission to use the car for the loanee's own purposes, be considered as an implied grant of such permission.

Appellants argue that the evidence is sufficient to support a finding that an implied permission on the part of Mrs. Buchanan existed, pursuant to which McElroy could use the automobile for his own purposes. In this connection, we note the rule that, unless there is neither competent evidence nor reasonable inference therefrom, the verdict of a jury should be sustained. *Scobba v. Seattle,* 31 Wn. (2d) 685, 198 P. (2d) 805; *Cugini v. Department of Labor & Industries,* 31 Wn. (2d) 852, 199 P. (2d) 593.

In considering this question, it must be borne in mind that there must be evidence supporting a finding that, from the evidence introduced, an implied permission may be inferred, disregarding any possible inference that, if McElroy had directly requested that the car be loaned to him for his own purposes, it is possible that Mrs. Buchanan

would have granted his request. The testimony affirmatively shows that McElroy made so such request.

Questions similar to that here presented have often been before courts of last resort in many states, and before Federal courts. Apparently, the decisions fall into three categories. There is authority for the proposition that, if a named insured grants to another the right to use the automobile for some particular purpose, a later use of the car by the permittee brings him within the intent of the applicable omnibus clause of a policy of liability insurance. Other courts have held that a use of the car which is no more than a "slight deviation" from the permitted use is still within the terms of the insurance coverage. A third line of authority supports a holding that the particular use made of the automobile by the permittee must be within the scope of the permission originally granted by the insured, and, if not within that permission, recovery may not be had against the insurer.

In this connnection, appellants rely upon the case of *Odden v. Union Indemnity Co.*, 156 Wash. 10, 286 Pac. 59, 72 A. L. R. 1363, in which this court affirmed a judgment in favor of the plaintiff in an action upon a policy of automobile liability insurance in favor of one injured, as the result of the negligence of the driver, while riding in the insured car.

It appeared that the policy was issued, May 28, 1927, to the owner of the automobile as named insured. By the terms of the policy, it was provided that:

" 'Condition K. The unqualified word "Assured," wher-, ever used in this policy, shall be construed to include, in addition to the named Assured in this policy, any person or persons while riding in or legally operating any automobile, insured hereunder and any person, firm or corporation legally responsible for the operation thereof with the permission of the named Assured, or if the named Assured be an individual, with the permission of an adult member of the Assured's household other than a chauffeur or domestic servant, except that the terms and conditions of this policy shall not be available to a public automobile garage, auto-

mobile repair shop, automobile sales agency, automobile service station and the agents or employees thereof. . . .' "

The plaintiff first sued the driver of the automobile and another person to whom the car had been turned over for indiscriminate use by the owner to whom the insurance had been issued. Plaintiff, having recovered judgment and having been unable to satisfy the same, sued the insurer. The trial court held that the owner turned the car over to one Hickey to use

" . . . as his own for business and pleasure and consented to the operation of said automobile by the said Hickey personally and by others."

The court further found that, for some time prior to the accident, Hickey used the car for business and pleasure and allowed and permitted others to use it for the same purposes, all of which was known to the owner.

In affirming a judgment in favor of the plaintiff, this court held that the findings of the superior court were supported by the evidence, and that the loan of the automobile by the owner

" . . . vested in Hickey full power, while the automobile was so in his possession, to use it personally for his own business or pleasure, and full power to permit its use by others for their own business and pleasure, as if he were the owner of the automobile."

In the course of the opinion, this court noted that, in the case of *Trotter v. Union Indemnity Co.*, 33 F. (2d) 363, and 35 F. (2d) 104, the United States district court and the circuit court of appeals of the ninth circuit had held that the plaintiff in an action before the district court, who was a passenger in the car at the time Odden was injured, could not recover against the indemnity company. The opinion calls attention to the fact that, from the opinions of the Federal courts, it appeared that, from the evidence introduced before the United States district court, the use of the car by Hickey was "shown to be limited to the special purpose of promoting a common business interest of Hickey" and the owner.

The opinion calls attention to the fact that the evidence introduced before the superior court showed a much more extended and greater authority on the part of Hickey to use and permit the use of the automobile than appeared from the evidence introduced before the district court.

From the opinion, it appears that the evidence introduced before the superior court in the *Odden* case showed that a very wide and almost unrestricted authority on the part of Hickey to use and permit the use of the car had been given Hickey by the owner, the named insured in the policy upon which recovery was sought.

In the case cited, the permission granted by the owner of the car to Hickey was very broad, indeed sufficient to authorize almost any use for business or pleasure by Hickey or any person whom he permitted to use the car. The case is not controlling here.

Appellants rely on several authorities cited by this court in the *Odden* case. The language of these decisions goes beyond the holding of this court in the *Odden* case, and we are not in accord with some of the language used in the cases referred to. In two of these cases, the permitted use was for the permittee's own convenience. In the other case, it was held that, if original permission for particular purposes was granted, that permission continued and authorized any subsequent use of the automobile by the permittee.

In the case of *Cypert v. Roberts,* 169 Wash. 33, 13 P. (2d) 55, it appeared that the plaintiff, Mrs. Cypert, had been injured as the result of a collision with an automobile belonging to Nalley's, Inc., driven by Dorothy Roberts. The plaintiffs brought suit to recover damages, on account of Mrs. Cypert's injuries, against both Miss Roberts and Nalley's, Inc. The jury returned a verdict in favor of the plaintiffs against both defendants. The trial court granted judgment in favor of Nalley's, Inc., notwithstanding the verdict, and entered judgment on the verdict against Miss Roberts. On appeal, the trial court was affirmed. *Cypert v. Nalley's, Inc.,* 163 Wash. 703, 300 Pac. 528. See, also,

*Mitchell v. Nalley's, Inc.*, 163 Wash. 183, 300 Pac. 526. The Cyperts, having been unable to realize on the judgment against Miss Roberts, caused a writ of garnishment to issue against General Casualty Company of America, which had issued a policy of insurance in favor of Nalley's, Inc., covering the car driven by Miss Roberts at the time of the accident. Trial of the action to a jury resulted in a verdict in favor of the plaintiffs, and judgment was entered thereon against the insurer. On appeal, this judgment was reversed. The cause was remanded, with instructions to enter judgment in favor of appellant.

The issuance of the insurance policy was admitted, the plaintiffs contending that, at the time of the accident, the car was being driven by Miss Roberts with the permission of Nalley's, Inc., the named assured. This court held that, when the accident occurred, Miss Roberts, who was an employee of Nalley's, Inc., was not acting in the course of her employment and that she did not, at that time, have express or implied permission to use the car.

This court stated the question to be determined in the following language:

"The issue is whether Miss Roberts had the permission of Nalley's, Inc., to use the car as and when the collision occurred. That she did not have such permission, express or implied, to use the car at the place, at the time, and under the circumstances, or for purposes existing at the time of the collision, was clearly established, and must be so held and declared as a matter of law."

In the course of the opinion, authorities cited by counsel for the respective parties were referred to generally, but none was cited. We held that:

"In order that the 'Additional Assured' part of the insurance contract should be operative, it was necessary, according to its terms, that the operator of the car have the permission of the named assured to use or operate the car."

Appellants argue that the case is not in point, calling attention to the fact that Miss Roberts was directed to return the car after one-half hour's use, and that her later use of the car was in direct violation of the specific permission which

she had received. Appellants argue that, in the case at bar, McElroy was given general permissive use of the automobile without restrictions.

We cannot agree with the foregoing proposition. It is true that Mrs. Buchanan, on the day of the accident, fixed no definite time for McElroy to bring the car back to its home base, but the record does not support appellants' contention that McElroy was given any general permissive use of the car without restrictions. If he was able to place the car in operation, he was to bring it to Mrs. Buchanan's home. If the car would not move under its own power, it would be towed. He did not request permission to use the car for purposes of his own (provided the car would operate), and no permission to use the car for his own convenience or pleasure was granted. It is true that he was not forbidden to use the car for his own pleasure, but no reasonable occasion existed for Mrs. Buchanan to place any such limitation on McElroy's actions.

The case last cited established for this state the principles of law which are controlling in the case at bar, and we adhere to the rule therein laid down.

In the case of *Globe Indemnity Co. v. Nodlere,* 69 F. (2d) 955, the circuit court of appeals for the tenth circuit court considered a problem which may be briefly stated as follows: One Langford was an employee of the water department in the city of Tulsa. His position was that of truck helper, his duties were to repair water mains. He was not a truck driver. The general foreman of the city garage promulgated a rule forbidding employees to use city automobiles except on city business. However, it had long been the custom for employees to use city cars for their own business or pleasure, first obtaining permission to do so from the superintendent or person in charge. It was also the custom for the employees of the water department to, themselves, select one person to act as foreman, and a few others to serve as laborers, on holidays. They were selected by lot.

On one holiday, Langford was selected as foreman of the warehouse and was the person in authority on that day.

During business hours he drove a city automobile on his own personal projects, and, in the course of driving the car, he injured the plaintiff, who sued Langford and the city for damages. Judgment was entered in favor of the city as a matter of law, but the plaintiff recovered judgment against Langford. Later, the plaintiff instituted a proceeding against the insurance company, which had issued a policy of liability insurance to protect the city against claims for damages occasioned by city automobiles. The case was tried before the United States district court. A judgment was entered by the court in favor of the plaintiff in the action. The case was appealed to the circuit court.

The opinion states that Langford had no permission to drive the car for his personal use. He knew the rule forbidding employees to use city automobiles otherwise than on city business. It appeared that, notwithstanding the rule referred to, it had long been the custom for employees to use city automobiles for their own business or pleasure, first obtaining permission to do so from the person in charge. The plaintiff contended that, since Langford was in charge on the day in question, he was vested with power, under the custom of long duration, to grant permission to other employees to use city automobiles for their private use, and that his act in using one himself should be held to have been done with the same binding permission.

The court unanimously held that Langford's use of the car was wrongful and without authority, and the judgment appealed from was reversed. While, of course, not directly in point, the opinion of the court has some bearing upon the question here presented.

■ The evidence in the case at bar does not show that McElroy had ever been permitted to use the car for his own purposes. While it does appear that he had driven the car approximately ten times, so far as the record shows, that use was confined to the business, convenience, or pleasure of Mrs. Buchanan or her family. The record affords no basis whatever for the assumption that Mrs. Buchanan had any reason for anticipating that, on the day in ques-

tion, McElroy would deviate from the particular object of the trip, namely, to start the car and return it to the Buchanan residence. The presumption, of course, was that there was something wrong with the mechanism of the car, and one would not be likely to consider even the possibility that, the car having stalled earlier in the day, a person who knew that situation would use the car for extended drives.

It clearly appears that McElroy's use of the car was not for the purpose of having it examined by an expert to determine the reason for its earlier failure to function, and it is equally clear that the early morning trip had nothing to do with McElroy's use of the car for his convenience. That trip had a definite objective which did not concern the driver. There is here presented no question concerning any "slight deviation" from the permitted use.

We decline to follow the authorities which adopt the principle that an original permission to use the car includes any use thereafter made of the vehicle.

In the case at bar, it appears that, at least on most occasions, when McElroy drove Mrs. Buchanan's car he did so as an accommodation for Mrs. Buchanan, and to accomplish a specific mission for her or for some family purpose. This is not a decisive element in the case at bar, and the result which we reach is not based upon that fact. It is merely an element entitled to some consideration.

We hold that, on the day of the accident, McElroy had not received permission from Mrs. Buchanan to use the car for his own purposes, and that the evidence does not support a holding that on that day he enjoyed any implied permission from her to use the car for his own personal pleasure or business.

The trial court properly ruled that the two verdicts rendered by the jury, one in favor of appellant Yurick and the other in favor of appellants Howe and McElroy, were not supported by the evidence, and was correct in vacating and setting aside the verdicts. The judgment entered dismissing and discharging, with prejudice, the writ of garnishment sued out by appellant Yurick directed to respond-

ent, is affirmed, and the judgment dismissing, with prejudice, the action instituted by Herman Howe and William C. McElroy against respondent, is also affirmed.

JEFFERS, C. J., STEINERT, MALLERY, and HILL, JJ., concur.