589 P.2d 180

**Edward J. GERETY, M.D., Petitioner,**

v.

**Henry C. DEMERS, Respondent.**

No. 11847.

Supreme Court of New Mexico.

Dec. 13, 1978.

Rodey, Dickason, Sloan, Akin & Robb, Bruce D. Hall, Albuquerque, for petitioner.

Marchiondo & Berry, Charles G. Berry, Albuquerque, for respondent.

## OPINION

EASLEY, Justice.

In the first trial of this medical-malpractice case plaintiff-appellant, Henry G. Demers, won a $67,000.00 jury verdict against defendant-appellee, Edward J. Gerety, M.D. On Dr. Gerety's appeal to the Court of Appeals the decision was affirmed. *Demers v. Gerety*, 85 N.M. 641, 515 P.2d 645 (Ct.App.1973). Certiorari was granted to Dr. Gerety by this Court which reversed and returned the case to the Court of Appeals with instructions to address certain issues. *Gerety v. Demers*, 86 N.M. 141, 520 P.2d 869 (1974). The Court of Appeals remanded the case to the trial court for a new trial. *Demers v. Gerety*, 87 N.M. 52, 529 P.2d 278 (Ct.App.1974). Demers applied for certiorari on his cross-appeal only. *Cert. denied*, 87 N.M. 47, 529 P.2d 273 (1974).

The second trial resulted in a verdict for Dr. Gerety and Demers appealed. The Court of Appeals again reversed and remanded the case to the lower court for a third trial. *Demers v. Gerety*, 17 N.M.St.B. Bull. 2373, March 16, 1978. We granted certiorari; and now on the *sixth* appellate proceeding for this case, we affirm in part and reverse in part.

*Issues*

The complexities of the facts, the law and the procedure in this case are incredible. The complaint was filed November 17, 1969, for injuries allegedly caused by the operation on November 13, 1967. The case has been haunting the parties and the judicial system for almost nine years. Generally the issues are:

1. Whether a trial judge who has presided over the first trial of a case may voluntarily recuse himself from presiding in the second trial without stating on the record that he has constitutional, statutory or ethical cause for so doing.

2. Where the time had long since expired under § 21–5–9, N.M.S.A.1953 (Supp. 1975) (current version at Interim Supp. 1976–77) for disqualifying a judge, whether the second trial judge, who was not even serving as a judge when the issues were joined in 1973, was legally precluded from trying the case by the filing of an affidavit of disqualification after the first judge recused himself and notice was given of the designation of the new judge.

3. Where the Court of Appeals held that a verdict should have been directed in favor of Dr. Gerety in the first trial because there was no expert medical testimony showing causation on the issue of negligent surgery, but the Court of Appeals, nevertheless, reversed and remanded the case for a new trial without specific directions or stated limitations, and then Demers did not apply for certiorari, whether the second trial judge was correct in refusing to admit additional evidence on negligent surgery and was correct in granting Dr. Gerety summary judgment on that issue.

4. Whether Demers' instructions given in the first trial without objections, which were refused in the second trial on the grounds that they did not accurately reflect the dispositive facts adduced in the second trial, are nevertheless the law of the case and should have been submitted in their original form to the second jury.

5. Whether a distinction exists in New Mexico between common law battery, based on unlawful touching because of an operation by a physician without the patient's consent, and malpractice, based on negligence in the care and treatment of a patient.

6. Where the first trial judge erroneously ruled and instructed the jury that the "clear and convincing" test of written contract law as applicable in appraising Demers testimony as to his competency to sign a consent, and where Demers did not apply for certiorari after the Court of Appeals erroneously affirmed the trial court's decision on this issue, whether the application of written contract law became the law of the case and thus controlling on the second

trial judge when he appraised and rejected Demers' testimony regarding drug induced incompetency as being insubstantial and refused to submit instructions on the issue to the jury.

7. Assuming that the evidence on motion for summary judgment must be considered without the application of the restrictive presumptions and the "clear and convincing" test of written contract law, erroneously applied by the two lower courts on the incompetency claim of Demers, was the evidence in the record sufficient to create a jury issue as to whether Demers consented to the revision of his ileostomy?

8. Whether in a physician-battery case it is necessary in all cases for the plaintiff to present expert medical witnesses to prove a medical standard against which to test the acts of the physician in diagnosing, treating and informing the patient, as well as to prove a violation of the standard and causation.

9. Where the issue of informed consent is raised in malpractice cases, whether it is mandatory that the claim of lack of informed consent be proved by testimony of expert medical witnesses as to the standard of care demanded, as to whether there has been a violation of that standard and as to whether the physician's acts or failure to act were the proximate cause of the patient's injuries.

10. If the strict rule mandating expert medical evidence in informed consent cases is relaxed, as it applies to proving the three issues above enumerated, whether an objective standard, based on the knowledge or skill of an *ordinary* patient or physician is to be used, or a subjective standard, based on the particular knowledge or skill of the parties involved.

The facts and the law pertaining to each of the above issues will be discussed in the order given.

### Need to State Reasons for Recusal

After the first remand, District Judge Gerald D. Fowlie, who presided at the first trial, recused himself without stating for

the record that he had a statutory, ethical or constitutional cause for disqualification. There was no evidence showing the reason for his disqualification. Judge Stowers was designated, after which nothing happened in the case for approximately twenty months. Judge Stowers recused himself, giving no reason therefor. Judge Maurice Sanchez was assigned to the case, at which time Demers filed an affidavit of disqualification which Judge Sanchez refused to honor. On appeal Demers claimed that it was error for Judge Fowlie to recuse himself and for Judge Sanchez to sit.

The Court of Appeals held that a district judge has a duty to enter an order stating that he has valid reasons for recusing himself, that to remain mute on this point constitutes an abuse of discretion and that refusing to hear the case without a compelling reason constitutes neglect of duty. That court reversed and ordered that Judge Fowlie sit for the third trial.

There are no constitutional or statutory provisions which specifically set forth the authority or the procedure for a judge to voluntarily recuse or disqualify himself. N.M.Const. art. 6, § 18 provides that a judge is disqualified when a party to the suit is related to him by affinity or consanguinity within the degree of first cousin, when he has been counsel in the suit or has presided over the trial as judge in an inferior court, or where he has an interest in the case. The New Mexico Code of Judicial Conduct provides that a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including instances where "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding". Canon 3(C)(1)(a) [§ 16–11–3(C)(1)(a), N.M.S.A.1953 (Supp.1975)]. Section 21–5–8, N.M.S.A.1953 (Repl.1970) provides that a judge may be disqualified by a party by the filing of an affidavit alleging that the judge cannot preside with impartiality.

In *Doe v. State*, 91 N.M. 51, 570 P.2d 589 (1977) this Court was called upon to interpret art. 6, § 15 of the New Mexico Constitution which states that if any judge shall be "disqualified" from hearing any cause the parties may select some member of the bar to act as judge pro tempore. We held that the term "disqualified" encompasses voluntary recusal. We further held that when a judge believes he will not be able to remain impartial he should use his discretion and remove himself from the case in order to avoid any hint of impropriety. We quoted with approval from *State v. Allen Superior Court No. 3*, 246 Ind. 366, 206 N.E.2d 139, 143 (1965) in which that court stated that the reasons for the judge to disqualify himself may be personal and that he need not state them.

We hold with the well-established principle that a judge has a duty to perform the judicial role mandated by the statutes, and he has no right to disqualify himself unless there is a compelling constitutional, statutory or ethical cause for so doing. *E. g., Rosen v. Sugarman*, 357 F.2d 794, 797–98 (2d Cir. 1966); *Duplan Corporation v. Deering Milliken, Inc.*, 400 F.Supp. 497, 526–27 (D.S.C.1975); *Arizona Conference Corp. v. Barry*, 72 Ariz. 74, 231 P.2d 426, 428 (1951); *Williams & Mauseth Ins. Brokers, Inc. v. Chapple*, 11 Wash.App. 623, 524 P.2d 431, 434 (1974). Recusal should be used only for the most compelling reasons. *Nelson v. Fitzgerald*, 403 P.2d 677 (Alaska 1965). A judge "has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified.*" *Laird v. Tatum*, 409 U.S. 824, 837, 93 S.Ct. 7, 15, 34 L.Ed.2d 50 (1972).

We approve of this statement by Justice Rehnquist in *Laird*, and hold that, except in those cases where a judge's impartiality might be reasonably questioned, he must exercise his judicial function. *See United States v. Haldeman*, 181 U.S.App.D.C. 254, footnote 360 at 362, 559 F.2d 31, footnote 360 at 139 (1976) (interpreting the latest version of the federal disqualification statute), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

However, when a judge recuses himself we must presume, in the absence of any evidence to the contrary, that he is doing so

in full conformity with his duty. We are very reluctant to interfere with a lower court's exercise, or refusal to exercise, its jurisdiction, and see no reason to do so here. *State v. Scarborough*, 75 N.M. 702, 410 P.2d 732 (1966). In holding that the judge must have good cause for recusal but need not state for the record that he has cause nor state the cause, we overrule the decision of the Court of Appeals on this issue. That court was in error in remanding the case for retrial by Judge Fowlie.

### Timeliness of Disqualification

The affidavit of disqualification directed to Judge Sanchez was filed after the first trial and the first appeal, which was several years after the time had expired under § 21–5–9 within which to disqualify a judge. Demers contends that the limitation in this statute should be read by this Court to mean that the time starts to run when the party who later seeks to disqualify the judge is given notice that the particular judge will try the case on its merits. To rule otherwise, Demers suggests, is to admit that, in cases such as this one, there is no method by which a judge, whom the moving party thinks to be partial, can be removed from the case without a hearing and actual proof of disqualification.

Section 21–5–9 provides for an affidavit of disqualification to be filed within ten days "after the cause is at issue" or within ten days "after the time for filing a demand for jury trial has expired", whichever is later. It does not say within ten days "after a new judge is designated to hear the case." The latter provision might be just and desirable, but it cannot be read into the statute. The provision for disqualification is not a court-made rule. It is a substantive right granted by the legislature, *Beall v. Reidy*, 80 N.M. 444, 457 P.2d 376 (1969). We have construed it strictly according to its plain language. *See State v. Hernandez*, 89 N.M. 698, 556 P.2d 1174 (1976).

The Court of Appeals was in error in holding that Judge Sanchez was properly disqualified.

### History of the Proceedings

Considering the volatility of the law of malpractice in the past decade and knowing that our courts and the litigants have had little New Mexico law to guide them, it is not surprising that a number of mistakes were made in this complicated suit. The mutually inconsistent actions of battery and malpractice were scrambled throughout the history of this case. "Malpractice" was replaced as an issue with "negligent surgery" in most of the proceedings. "Informed consent" was considered most of the time as a separate and distinct issue from "legal consent." The law of written contracts was erroneously applied to construe the written consent for surgery. Numerous other errors committed by the parties and the courts have made a morass of the issues.

Demers' complaint alleged "negligent surgery", "lack of legal consent" and performance of an operation "different from the one authorized." The alleged unauthorized surgery was not described as "battery" in the complaint. These three claims were submitted to the jury in an instruction requested by Demers in which he described all three of the acts as "malpractice." None of the other instructions made a specific distinction between battery based on unauthorized touching, and malpractice based on negligence. In fact, on Demers' own request, the jury was instructed that it is "malpractice" for a physician to perform an operation which was not agreed to by the patient.

Dr. Gerety protected his record by motions for directed verdicts and for a judgment n. o. v., all of which were denied by the first trial court. Numerous Demers' instructions bearing on informed consent were also submitted to the jury without objection. The jury returned a verdict for Demers.

Dr. Gerety appealed, alleging errors by the judge in refusing his motions for a directed verdict and for judgment n. o. v. He also claimed there were errors in submitting each of Demers' claims to the jury. Demers' third issue of "performance of an

operation different from the one authorized" raised in Demers' complaint and in his theory instruction, was not mentioned. The third issue on appeal became one of "informed consent." Two other issues were raised by Dr. Gerety that are not material at this point.

Demers cross-appealed claiming errors in giving and refusing instructions which will be discussed elsewhere.

The issue instruction submitted by Demers and given to the jury specified that the jury should find for Demers if they determined that he had proven any one of his three claims. Dr. Gerety did not object to this instruction. The Court of Appeals held that the submission of the three issues in the alternative without objection thus became "the law of the case," and ruled that it was only necessary to determine whether there was evidence to support "any" of Demers' three theories. The court then held that Demers' claim regarding lack of consent to the surgery was supported by substantial evidence and declined to rule on Dr. Gerety's other two issues.

The court further held that "[t]here was medical testimony that all the subsequent medical complications plaintiff suffered were the result of the hernia repair and ileostomy revision," that the entire course of surgery was "unconsented to and therefore tortious" and that the incisions were "injuries inflicted by the defendant." 85 N.M. at 646, 515 P.2d at 650. (However, that court in the second opinion repudiated this finding of causation and held that, because of lack of any expert medical testimony to prove proximate cause, a verdict should have been directed by the trial court on the issue of negligent surgery.) The court did not reach the issues raised in Demers' cross-appeal.

When the case came to this court on certiorari, Justice Stephenson stated in our decision that the issues were negligent performance of surgery, lack of consent to surgery and lack of informed consent. This Court held that under the provisions of N.M.R.Civ.P. 50(b) [§ 21–1–1(50)(b), N.M.S. A.1953 (Repl.1970)] a motion for a directed verdict and its denial always preserves for review the question whether, under the law applicable to the case, there is an adequate evidentiary basis. We then remanded the case to the Court of Appeals with directions to consider whether there was substantial evidence to justify the submission of plaintiff's theories of negligent surgery and lack of informed consent.

Upon remand the Court of Appeals proceeded to consider the two issues mentioned. The details of the operations performed and the surrounding circumstances are contained in the prior Court of Appeals' decisions, 85 N.M. at 644–45, 647–654, 515 P.2d at 648–49, 651–58; 87 N.M. at 53, 529 P.2d at 279; 17 N.M.St.B.Bull. 2373, March 16, 1978; and will not be repeated here. Based on these facts the Court of Appeals held that Dr. Gerety's failure to make a "long enough stoma" was not traced by expert medical testimony as the cause of the "boil" or abscess on Demers' bowel wall that had produced a bowel obstruction which had in turn caused a second operation and injuries to Demers. The court correctly held that lay testimony under the facts would not suffice to show causation. *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977). The Court of Appeals stated: "Since there was no expert testimony, there was no issue as to causation and the trial court incorrectly denied defendant's motion to direct a verdict on the issue of negligent surgery." The court further pointed out that in the prior opinion it had decided there was lack of consent; thus, "it goes without saying, there could not have been any informed consent." *Demers*, 87 N.M. at 53, 529 P.2d at 279.

The court reversed and remanded for a "new trial consistent with this opinion." There were no other specific directions or limitations contained in the remand order or the mandate regarding issues to be tried. Neither party asked for clarification as to what issues would properly be for trial after remand. Although Demers applied for certiorari on a requested instruction on burden of proof, he did not ask for certiorari to review the holding of the Court of Appeals

that the trial court was in error in denying Dr. Gerety's motion to direct a verdict on the issue of negligent surgery. On the other hand, Dr. Gerety could have applied for certiorari to review the decision ordering a new trial and could have moved to limit the issues in the second trial. He did neither.

After the case was remanded and Judge Sanchez was assigned to try it, he refused to hear additional expert medical evidence on causation, ruling that the issue had been fully litigated through the Court of Appeals and had been definitely decided against Demers. The court held that action "consistent with this opinion" meant dismissing negligent surgery from the case. The second trial judge submitted the case to the jury only on the question of "legal consent." The second jury verdict was in favor of Dr. Gerety. Demers went to the Court of Appeals, claiming his right to a new trial on all questions and also raising numerous questions about the instructions and disqualification of the judge, which are discussed elsewhere.

On the third time before the Court of Appeals, the court ruled that the first trial judge had erroneously recused himself and that the second trial judge was disqualified, issues that have heretofore been discussed. That court further held that the trial court was in error in refusing Demers' request that negligent surgery be again submitted to the jury and in failing to follow the doctrine of the law of the case by refusing to give instructions from the first case. The case was remanded for a third trial on all issues.

*Negligent Surgery as Issue in Second Trial*

■ We now consider whether medical malpractice, or negligent surgery as it was called throughout the proceedings, should have been submitted to the jury in the second trial. Dr. Gerety urged that the courts had effectively adjudicated that issue, had eliminated it as a part of a new trial, and had made it mandatory that the second trial judge direct a verdict without further evidence. Demers contended that

the mandate for a "new trial" without specific limitations meant that he was entitled to a new trial on all of the issues.

In *Montoya v. Ortiz*, 24 N.M. 616, 175 P. 335 (1918), we held that the court is invested with the discretion to either render the final judgment, direct a lower court to enter final judgment, or remand the case for a new trial or other proceeding. *See Ortega v. Ortega*, 33 N.M. 605, 273 P.2d 925 (1928); *In re Keels' Estate*, 37 N.M. 569, 25 P.2d 806 (1933). The early case of *State ex rel. Bujac v. District Court*, 28 N.M. 28, 205 P. 716 (1922) contains an analysis of the law that indicates logical and reasonable parameters for the court's authority in these cases. However, *Bujac* is somewhat different on the facts from our case. This Court in *Bujac* did not specifically order a new trial but simply reversed and remanded the case with directions to "proceed in accordance herewith." In that decision, however, this Court had ruled that Bujac failed to establish his claim. On remand the case was redocketed; notice was given to Bujac that a judgment would be entered against him on a given date by the district court without further trial; he failed to respond to the notice; and the court entered a judgment against him based on this court's finding that he had not established his claim. Bujac sought to vacate the judgment, but failed. He appealed. This Court on affirming the judgment below said:

> In most jurisdictions it is said that, where it appears that the facts have been fully developed upon the trial, a new trial will not be ordered upon reversal of the judgment, but the proper judgment will be rendered by the appellate court, or ordered to be rendered by the court below.

*Id.* at 36, 205 P. at 719–20.

The *Bujac* court stated further that the appellate court should:

> [E]ither render the proper judgment or direct the lower court to do so, except in those cases where such action is prevented by the circumstances, or where legal injustice would thereby result to one of the parties. Ordinarily the parties should go back to the point where the error

occurred, and the case should proceed from that point to a conclusion, unless the circumstances prevent such a course.

*Id.* at 50, 205 P. at 725.

In *Bujac,* the court's ruling, based on the fact situation as it exists in the instant case, would be as follows:

[T]here is no reason why, upon reversal, and in the absence of controlling circumstances of necessity, that there should be another trial of the issues. Unless prevented by the erroneous rulings of the trial court, each party to the cause is presumed to have put forward all of the facts in his possession reflecting upon the issues involved. If they fail to do so, the facts and circumstances not so presented are deemed to have been lost or waived. (Citations omitted.)

*Id.* at 52, 205 P. at 726. The reasoning is fully applicable here.

We reject the principle advanced by the Court of Appeals, based on *Byrne v. Prudential Ins. Co. of America,* 88 S.W.2d 344 (Mo.1935) and other authorities, that a new trial may be ordered on the sole basis of the court finding that, although there is a failure of proof, the court is convinced that the plaintiff on retrial can adduce further proof to make out a prima facie case.

In *Porter v. Porter,* 65 N.M. 14, 331 P.2d 360 (1958), on the issue here addressed, almost identical facts as in this case were present. This Court, on rehearing of the second appeal, held that the case had been fully tried on the merits as to the sufficiency of the evidence to sustain the judgment and that, even though there was an error of law, no further proof on that matter would be allowed.

It would appear from this analysis of the law that the Court of Appeals should have either ordered judgment for Dr. Gerety on the issue of negligent surgery or should have instructed the trial court to do so. It did neither, but simply sent the case back for a "new trial consistent with this opinion." There is no showing of "controlling circumstances of necessity" for another trial on negligent surgery, and we find that no legal injustice has been done to either party. We overrule the Court of Appeals.

*Law of the Case*

In *Ute Park Summer Homes Ass'n v. Maxwell Land G. Co.,* 83 N.M. 558, 494 P.2d 971 (1972) this Court stated that the doctrine of the law of the case has long been recognized in New Mexico, describing the substance of the doctrine to be:

If an appellate court has considered and passed upon a question of law and remanded the case for further proceedings, the legal question so resolved will not be determined in a different manner on a subsequent appeal.

*Id.* at 560, 494 P.2d at 973.

In *Varney v. Taylor,* 79 N.M. 652, 448 P.2d 164 (1968), as here, the case had been up for the third time on appeal to this Court. The court reiterated our rule that we are committed to the "right or wrong" principle under which a decision upon a former appeal is binding upon the appellate court on the second appeal, whether or not it is in error. The Court further held, "that the law of the case doctrine applies not only to questions which are expressly or by necessary implication raised and ruled upon in the prior appeal, but also to questions which might have been but were not raised or presented. *Jencks v. Goforth,* 57 N.M. 627, 261 P.2d 655; *Sanchez v. Torres,* [38 N.M. 556, 37 P.2d 805 (1934)]." *Id.* at 654, 448 P.2d at 166. The court in *Varney,* then proceeded to rule that an erroneous adjudication even as to jurisdiction becomes the law of the case and is binding in all subsequent proceedings.

We hold that the second trial court was correct in directing a verdict for Dr. Gerety on the issue of negligent surgery. We realize it raises a question as to whether any litigable issue remained after causation was eliminated, considering that battery was not properly raised; but we are here confronted with the accomplished fact that a new trial has already been conducted with the issue of legal consent as the only claim litigated.

■ On the basis of the rule laid down in *Varney* and other cases we also reject the

sua sponte holding of the Court of Appeals that Dr. Gerety waived his right to rely on his motion for a directed verdict by waiting twenty months after the first mandate came down to again assert his claim. This question was not raised by Demers at any level. There was no evidence showing the cause for delay, and Demers had the burden of proof. The trial court made no finding of waiver. This must be regarded as a finding against Demers. *Farrar v. Hood*, 56 N.M. 724, 249 P.2d 759 (1952). The question was presumptively decided against Demers on the second appeal and became the law of the case.

The Court of Appeals holding that the trial court should have directed a verdict on negligent surgery, not having been brought to this Court for review has been waived and cannot now be relied upon as error by Demers.

*First Instructions as Law of the Case*

Demers made numerous objections in both trials to the court's giving and refusing to give instructions. Only a few of these are material at this point. The Court of Appeals in its last opinion held that four instructions on informed consent and one on circumstantial evidence that were given and not objected to by Dr. Gerety in the first trial became the law of the case and should have been given in the second trial.

Before determining whether these instructions were proper, it is necessary to analyze other instructions that were given in the first trial. Regarding Demers' written consent to surgery the jury was instructed that the law presumes that a person was competent at the time he signed a written instrument; that it is plaintiff's burden to overcome the presumption of his competency; that he must do this by "clear and convincing" evidence; that evidence is only clear and convincing if it "instantly tilts the scales in the affirmative"; that it is the duty of every person to read an instrument before he signs; that, if he fails to read the instrument, he cannot claim his intentions were other than as represented in the instrument.

The giving of the above instructions was sustained by the Court of Appeals by its first two opinions, except that the second opinion found error in the first trial court's failure to instruct that "if a party is incompetent (or under such sedation as would destroy competency) at the time of entering in a contract, that agreement is invalid. (Citations omitted)." *Demers, supra*, 87 N.M. at 54, 529 P.2d at 280. Demers applied for certiorari to review only a small number of the issues involving the consent, and the writ was denied by this Court. *Demers, supra*, 87 N.M. 47, 529 P.2d 273 (1974).

■ If we follow Demers' admonition that instructions given in the first trial become the law of the case, he has snared himself with his own noose. In fact, Demers tendered instructions in the second trial that contained most of the language set forth in the instructions given in the first trial. The issue of the application of written contract law to Demers' written consent was fully litigated and erroneously decided adversely to Demers' position. N.M.U.J.I. Civ. 8.1 specifies that malpractice is a "form of negligence". In *Schrib v. Seidenberg*, 80 N.M. 573, 458 P.2d 825 (Ct.App.1969) it was so held. Contract law is patently inapplicable and the Court of Appeals was in error in this regard.

This decision on the law became more important on remand than merely a holding that instructions once given and not objected to become the law of the case. The Court of Appeals held that "competency is presumed in the law", and that plaintiff "must rebut that presumption". *Demers, supra*, 87 N.M. at 53, 529 P.2d at 280; *Grannum v. Berard*, 70 Wash.2d 304, 422 P.2d 812 (1967). At the time the second trial judge was assessing Demers' proof that he was drugged and incompetent to sign the consent to revise his ileostomy, the judge had before him the decisions of the Court of Appeals. He relied upon the law of written contracts to decide whether there was a proper quantum of evidence to warrant submission of the question of informed consent to the jury. He applied the presump-

tions called for in the first instructions and the "clear and convincing" test to Demers' claim of incompetency and found that there was insufficient evidence to warrant submission to the jury.

There being no justiciable issue, the instructions bearing on informed consent were refused by the trial judge. We find no abuse of discretion since the evidence introduced to support Demers' claim that he was under sedation when he signed the consent to the operation was obviously short of being clear and convincing, and there was no substantial evidence of failure to properly inform Demers. Since informed consent was not properly an issue in the second trial, giving the instructions from the first trial on that issue would have introduced false questions before the jury that would have been clearly misleading.

The law of the case as to the application of written contract law was properly applied. *Varney, supra.* Demers did not take the necessary steps to establish as the law of the case the Court of Appeals' decision that there was no consent or informed consent to surgery. We reverse the part of the last decision of the Court of Appeals holding that these instructions should have been given.

As to Demers' claim that the court erred in failing to give his requested instruction on circumstantial evidence, he did not call the attention of the trial court or of either appellate court to evidence in the record that justified the submission of this instruction. We will not review the record to find support for Demers' claim. *Chavez v. Chenoweth,* 89 N.M. 423, 553 P.2d 703 (Ct.App.1976). We reverse the decision of the Court of Appeals on this question.

### Battery v. Malpractice

Because of the shambles that this case has left in the New Mexico law of malpractice and physician-battery, we are compelled to analyze and define the nomenclature and the components of various issues arising in these cases.

In the past twenty years, since the decision in *Salgo v. Leland Stanford, Jr. Univ. Bd. of Trustees,* 154 Cal.App.2d 560, 317 P.2d 170 (1957), which first introduced the theory of "informed consent" in medical malpractice suits, few legal issues have generated as great confusion and as great a volume of cases and law review articles. The cases, which deal with a vast number of conflicting theories, demonstrate rapid and radical changes in this field of law. *E. g.,* the list of authorities in the concurring opinion of Sutin, J., in *Demers, supra,* 85 N.M. at 649, 515 P.2d at 653; *Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520 (1962); *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Shetter v. Rochelle,* 2 Ariz.App. 358, 409 P.2d 74 (1965) *modified on rehearing,* 2 Ariz.App. 607, 411 P.2d 45 (1966); *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093 (1960); *Bang v. Charles T. Miller Hospital,* 251 Minn. 427, 88 N.W.2d 186 (1958); *Aiken v. Clary,* 396 S.W.2d 668 (Mo.1965); *Mitchell v. Robinson,* 334 S.W.2d 11 (Mo.1960), *aff'd after remand,* 360 S.W.2d 673 (Mo.1962); *Corn v. French,* 71 Nev. 280, 289 P.2d 173 (1955), *aff'd after remand,* 74 Nev. 329, 331 P.2d 850 (1958); *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966); Plant, *The Decline of "Informed Consent",* 35 Wash. & Lee L.Rev. 91 (1978); Riga, *Informed Consent,* 10 Lincoln L.Rev. 159 (1977).

A favorite starting place for literature on "informed consent" is the statement of Justice Cardozo in *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92, 93 (1914) that:

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.

The right of self-determination by an informed patient has developed as the most important ingredient in the law on this subject.

At the outset it must be emphasized that one of the greatest causes of confusion is the failure to distinguish between causes of action founded on battery and those based on negligence. *Cobbs, supra*; Plante, *An Analysis of "Informed Consent,"* 36 Fordham L.Rev. 639, 650 (1968).

Under the legal rubric of battery, courts have jealously guarded a patient's right to know and to agree to what a physician or surgeon intends to do to him. An intentional touching to which a patient has given no consent is considered a battery. W. Prosser, Handbook of the Law of Torts, § 18, at 102–6 (4th ed. 1971). Katz, *Informed Consent—A Fairy Tale? Law's Vision*, 39 U.Pitt.L.Rev. 137, at 144 (1977).

■ To defeat a battery claim, however, the information which must be disclosed is quite narrow in scope. A physician only has to inform the patient of the *nature* of the procedure; that is, what the doctor proposes to do to him. Failure to advise the patient of this minimal basic information admits of no excuse, except when an emergency requires intervention without delay. Katz, *supra*, citing *Cobbs, supra; Schloendorff, supra*; and, McCoid, *A Reappraisal for Liability for Unauthorized Medical Treatment*, 41 Minn.L.Rev. 381 (1957).

■ The only question that is asked in a battery case is did the patient know and agree to what was going to be done to him. If not, the law does not require the patient to be physically damaged by the intervention. Even if his health is significantly improved, the doctor is still liable. Informed consent is not a key issue. There need be no proof that the patient may have gone ahead with the operation had the doctor fulfilled his duty to disclose the nature of the procedure.

Generally included in the battery cases are those instances where the patient consented to the performance of one kind of operation and the physician performed a substantially different one for which consent was not obtained, as is alleged by Demers in this case. These are considered to be clear cases of battery, as opposed to malpractice, which is based on negligence. *Cobbs, supra; Bang, supra*, (plaintiff consented to a prostrate resection when uninformed that this procedure involved tying off his sperm ducts); *Corn, supra*, (patient consented to an exploratory surgery but the doctor performed a mastectomy).

■ The importance of distinguishing between the two types of action becomes apparent when it is considered that in most medical malpractice suits expert medical testimony must be adduced to establish a standard of care, to assess the doctor's performance in light of the standard, and to prove causation. In battery cases it has generally been held that expert medical testimony is not required to establish a standard of care or to show causation. *Cobbs, supra*. This makes the case much easier for the plaintiff to prove. The factual issue is whether the patient did or did not consent to the specific operation performed by the physician. It is not a question of what the doctor *should* have told his patient about the nature of the operation but whether he *did* tell him what was going to transpire. In other areas of litigation jurors have the daily responsibility of assessing conflicting testimony and determining what was said and what agreements were reached by litigants. There is nothing unique about the doctor-patient relationship that warrants a rule that in all cases expert medical testimony is required to establish what was agreed to by the parties. *Shetter, supra; Cobbs, supra*.

■ As to causation in a battery action, the tort of battery is the wrongful touching of the patient's body which by itself gives the patient a claim for substantial damages. *Shetter, supra*.

In *Cobbs, supra*, the court held:

The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate

intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence.

104 Cal.Rptr. at 512, 502 P.2d at 8.

We agree that there should be such a distinction between battery and malpractice.

It is now generally held that an action involving lack of informed consent does not lie within the traditional concepts of battery. Where a patient is informed by a physician as to the nature and extent of the operation but is not reasonably informed of the risk involved, the cause of action is in negligence. *Murriello v. Crapotta*, 51 App.Div.2d 381, 382 N.Y.S.2d 513 (1976). This failure is considered in most jurisdictions to be a negligent breach of professional standards of conduct. *Di Filippo v. Preston*, 3 Storey 539, 53 Del. 539, 173 A.2d 333 (1961); *Kaplan v. Haines*, 96 N.J. Super. 242, 232 A.2d 840 (1967). This line of authority holds that where a physician does not disclose all the information deemed material to his patient's decision, it nullifies the consent obtained prior to treatment. This has become known as the "materiality" standard. The physician is required to disclose the factors that might reasonably influence the patient in his decision, such as the inherent potential hazards of the proposed treatment, any alternatives to that treatment, and the results likely if the patient remained untreated.

There is no New Mexico authority precisely in point. This may well be a case of first impression on the narrow question of whether expert medical testimony is mandatory to establish the care which would be used by reasonably well-qualified specialists in the same field practicing under similar circumstances in disclosing the risks and complications of the procedures employed in an operation.

Other than the earlier Demers case, the only New Mexico case that comes close to the question is *Woods, supra,* which is not wholly analogous to the facts. That case caused a considerable amount of criticism and discussion. Karchmer, *Informed Consent: A Plaintiff's Medical Malpractice "Wonder Drug",* 31 Mo.L.Rev. 29 (1966); Myers, *Informed Consent in Medical Malpractice,* 55 Cal.L.Rev. 1396 (1967); Plante, *supra,* 36 Fordham L.Rev. 634; Waltz & Scheuneman, *Informed Consent to Therapy,* 64 N.W.Univ.L.Rev. 628 (1970).

In *Woods, supra,* the patient claimed that the doctor failed to inform her of the dangers inherent in the medical procedures and told her that "no harmful results could occur, knowing that statement to be untrue." *Id.* 71 N.M. at 223, 377 P.2d at 521. It was shown that the plaintiff had no knowledge of the procedures and no basis on which to predicate her consent to the treatment. There was no medical testimony establishing the causal relationship, and the doctor contended that the lay testimony of plaintiff as to the cause of a physical condition was inadmissible. Mrs. Woods had taken electroshock treatments and claimed that it resulted in loss of hearing. Her testimony was the only evidence on the causal connection between the electroshock treatments and the loss of hearing. This Court considered the duties of a doctor to advise his patient as to the probable consequences and the dangers connected with it, and, in ruling on a motion of the doctor for a directed verdict, stated:

A physician who misleads a patient by not only failing to give a warning of *reasonable and recognized risks inherent in a treatment after which the patient would have refused the treatment,* but by affirmatively assuring her that there are no risks, knowing such statement to be untrue, is liable for the harmful consequences of the treatment. Such a failure to disclose, or the giving of an untrue answer as to the probable consequences of a treatment constitutes malpractice;

and a doctor who fails to so advise his client, or gives an untrue answer as to such consequences, is liable for malpractice unless his failure to do so comes within one of the exceptions to the rule requiring candor and disclosure. Under the circumstances of this case, a fact issue was presented for determination by the jury upon which there was no necessity for expert medical testimony.

*Id.* at 229, 377 P.2d at 525.

To the extent that *Woods* may hold that it is never necessary to have medical testimony on the question of the quantum of information to be given a patient about the dangers of medical procedures in order to obtain the consent to an operation, *Woods* is opposed to the general rule. Many jurisdictions that have decided the issue hold that it is necessary that standards be established by expert medical testimony on this issue, as well as on the issue of causation, so that the acts of the doctor in question may be measured by the usual practices of specialists in the same field under similar circumstances. Plante, *supra,* 36 Fordham L.Rev. 639. Reading *Woods* more strictly, it is arguable that the court's decision was based on the misrepresentation practiced by the physician.

The case of *Canterbury, supra,* is by far the best reasoned and authoritative in the field. *Canterbury* recognized that a majority of the courts at that time made the duty to disclose depend on whether it was the custom of physicians practicing in the community to make the particular disclosure to the patient. *E. g., Di Filippo, supra; Roberts v. Young,* 369 Mich. 133, 119 N.W.2d 627 (1963); *Aiken, supra.* Thus the physician could be held liable for an unreasonable and injurious failure to divulge, but no recovery would be forthcoming unless the omission forsakes a practice prevalent in the profession. However, *Canterbury* disagreed that there must be an existence and non-performance of a professional tradition. The court claimed that the physician's obligation is not limited by medical practice. The court senses a danger that such a holding would be taken as an affirmative custom to maintain silence. Binding the disclosure obligation to medical usage would be "to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." *Canterbury,* 150 U.S.App.D.C. at 275, 464 F.2d at 784. (Footnotes omitted.)

In discussing the "reasonably prudent person" doctrine, the *Canterbury* court quoted from *Wash. Hosp. Center v. Butler,* 127 U.S.App.D.C. 379, 383, 384 F.2d 331, 335 (1967):

> The law requires those engaging in activities requiring unique knowledge and ability to give a performance commensurate with the undertaking;

and held that physicians are required to act as reasonable men who possessed their medical talents presumably would, stating:

> There is * * * no basis for operation of the special medical standard where the physician's activity does not bring his medical knowledge and skills peculiarly into play. * * * The decision * * is ofttimes a non-medical judgment and, if so, is a decision outside the ambit of the special standard.
>
>    *     *     *     *     *     *
>
> When medical judgment enters the picture and for that reason the special standard controls, prevailing medical practice must be given its just due. In all other instances, however, the general standard exacting ordinary care applies, and that standard is set by law. * * * We hold that the standard measuring performance of that duty by physicians, as by others, is conduct which is reasonable under the circumstances.

*Canterbury,* 150 U.S.App.D.C. at 276, 464 F.2d at 785 (footnotes omitted).

*Canterbury* held that "full disclosure" is obviously prohibitive and unrealistic. It expects physicians to discuss with their patients every risk of proposed treatment no matter how small or remote:

[The physician] cannot know with complete exactitude what the patient would consider important to his decision, but on the basis of his medical training and experience he can sense how the average, reasonable patient expectably would react. * * *

The scope of the standard is not subjective as to either the physician or the patient; it remains objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation.

\*   \*   \*   \*   \*   \*

The topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated. * * *

There is no bright line separating the significant from the insignificant; the answer in any case must abide a rule of reason. Some dangers—infection, for example—are inherent in any operation; there is no obligation to communicate those of which persons of average sophistication are aware. Even more clearly, the physician bears no responsibility for discussion of hazards the patient has already discovered, or those having no apparent materiality to patients' decision on therapy. * * * Whenever non-disclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts.

*Id.* 150 U.S.App.D.C. at 278–79, 464 F.2d at 787–88 (footnotes omitted).

The *Canterbury* court recognized exceptions to the general rule of disclosure, such as, "when the patient is unconscious or otherwise incapable of consenting," and when the patient is so ill or emotionally distraught as to foreclose a rational decision, or complicate or hinder the treatment. In these cases it becomes a question of sound medical judgment that the risk information would present a threat to the patient's well-being.

The court in *Canterbury* held that there must be a causal connection between the physician's failure to adequately inform and damage to the patient:

[A] technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. * * *

* * * It places the physician in jeopardy of the patient's hindsight and bitterness. * * *

Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. * * * The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings.

\*   \*   \*   \*   \*   \*

* * * [T]he patient has the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and ultimately the burden of proof—the risk of nonpersuasion—on those elements. * * The burden of going forward with evidence pertaining to a privilege not to disclose, however, rests properly upon the physician.

*Id.* 150 U.S.App.D.C. at 281–82, 464 F.2d at 790–91 (footnotes omitted).

Most jurisdictions have now accepted an objective test based upon what a prudent person in plaintiff's position would have decided if suitably informed of the significant perils involved. *Karp v. Cooley*, 493 F.2d 408, 422, n.18 (5th Cir. 1974), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974); *Bowers v. Garfield*, 382 F.Supp. 503, 505–6 (E.D.Pa.1974), *aff'd,* 503 F.2d 1398 (1974); *Cobbs, supra.* Under this theory, the cause of action would then be available only if the non-disclosed facts would have altered a reasonably prudent person's decision to undergo treatment, rather than that of the particular patient. *Zeleznik v. Jewish Chronic Disease Hospital*, 47 App. Div.2d 199, 366 N.Y.S.2d 163, at 171–72 (1975).

In discussing the need for expert testimony in non-disclosure cases, the *Canterbury* court stated that experts are ordinarily indispensable to identify and elucidate for the fact-finder the risks of therapy and consequences of leaving existing maladies untreated, as well as the cause of injuries or disability and the nature and seriousness of any impact upon the patient from risk disclosure. However, that court also recognized that,

> medical facts are for medical experts and other facts are for any witnesses—expert or not—having sufficient knowledge and capacity to testify to them. * * * [M]any of the issues * * * do not reside peculiarly within the medical domain. Lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment.

*Canterbury*, 150 U.S.App.D.C. at 283, 464 F.2d at 792 (footnotes omitted).

We approve of and adopt the language from *Canterbury* repeated herein.

In light of the above law, some of the evidence introduced by Demers indicates what amounts to a classic case of common law battery, based on Dr. Gerety's performing an operation which he had, allegedly, been specifically told not to perform; which constituted an unlawful touching. On the other hand, Demers also made allegations which would, if proved, sustain a claim of medical malpractice based on negligence. N.M.U.J.I. Civ. 8.2. However, Demers failed to properly plead or request valid instructions on battery. On the issue of medical malpractice no expert medical testimony was produced to prove causation and a verdict was properly directed on that issue.

■ On the question of the validity of Demers' consent to surgery, the second trial court did not commit error in applying the "clear and convincing" test to Demers' evidence of drug-induced incompetency, that rule having been established as the law of the case. In any event, the combined record in both trials furnishes no substantial evidence to justify the submission of this issue to the jury or to support a verdict based upon the incompetency of Demers at the time he signed the consent. The Court of Appeals was in error in ordering a new trial.

We held in *Pharmaseal, supra* :

> Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to the standards of care is not essential.

*Id.* 90 N.M. at 758, 568 P.2d at 594.

■ We see no reason to deviate from the rationale behind the decision in *Pharmaseal* that the use of expert medical testimony should be employed when the trial court reasonably decides that it is necessary to properly inform the jurors on the issues. This includes establishing the standard of care, treatment and information by which the actions of the physician are to be judged, the manner in which he measures up to the standard and whether his alleged acts were the proximate cause of the injuries involved.

■ We reject the wording in *Woods, supra*, relied upon by the Court of Appeals, which would establish a principle of "full and complete disclosures" and to the "subjective" method of determining the standard for informing the patient. *See Demers, supra*, 85 N.M. at 645, 515 P.2d at 649. We adopt an "objective" standard, based on the knowledge or skill of an ordinary patient or physician, as being the most reasonable theory for both parties involved.

The Court of Appeals' decision is reversed. The trial court's decision is affirmed. Judgment is hereby granted in favor of Dr. Gerety.

IT IS SO ORDERED.

McMANUS, C. J., and SOSA, PAYNE and FEDERICI, JJ., concur.